**Gary W. Osborne (Bar No. 145734)**
**Dominic S. Nesbitt (Bar No. 146590)**
OSBORNE & NESBITT LLP
101 West Broadway, Suite 1330
San Diego, California 92101
Phone: (619) 557-0343
Fax: (619) 557-0107
gosborne@onlawllp.com
dnesbitt@onlawllp.com

Attorneys for Plaintiff, STEM, INC.

## UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEM, INC.,<br>a Delaware Corporation,<br><br>        Plaintiff,<br><br>vs.<br><br>SCOTTSDALE INSURANCE<br>COMPANY, an Ohio Corporation,<br><br>        Defendant. | CASE NO. 3:20-cv-02950-CRB<br><br>Assigned to Honorable Charles R. Breyer<br><br>**PLAINTIFF STEM, INC.'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING SCOTTSDALE INSURANCE COMPANY'S DEFENSE OBLIGATIONS**<br><br>Date:    April 29, 2021<br>Time:   10:00 a.m.<br>CTRM:  6 |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on April 29, 2021, at 10:00 a.m., or as soon thereafter as counsel may be heard before the Honorable Charles R. Breyer, in Courtroom 6 of the United States District Court, located at 450 Golden Gate Avenue, San Francisco, California, 94102, plaintiff Stem, Inc. will and hereby does move the Court for partial summary judgment regarding defendant Scottsdale Insurance Company's defense obligations.

Stem seeks partial summary judgment related to its First and Second Claims for Relief. Specifically, Stem seeks partial summary judgment that Scottsdale has breached its defense obligations owed to three of Stem's directors, Messrs. Zeb Rice, John Carrington and David Buzby, who are named in a pending lawsuit filed in the San Mateo County Superior Court entitled *Stacey Reineccius, et al. v. Zeb Rice, et al.*, and assigned Case No. 17CIV02098 (the "2017 Shareholder Lawsuit").[1]

This motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declarations of Gary Osborne, David Buzby, John Carrington, Bill Bush and Brian Thompson, Stem's Appendix of Exhibits, all pleadings and papers on file in this action, and upon such other matters as may be presented to the Court at the time of the hearing.

## ISSUE TO BE DECIDED

Whether Scottsdale's failure to defend Messrs. Zeb Rice, John Carrington and David Buzby against the 2017 Shareholder Lawsuit constitutes a breach of its defense obligations under *two* policies it issued to Stem, namely policy number EKS3113947 in effect from October 27, 2013 to October 27, 2014, and policy number EKS3202928 in effect from October 27, 2016 to October 27, 2017.

---

[1] *See* Fed. R. Civ. P. 56 (a) (permitting parties to identify "the part of each claim or defense" on which summary judgment is sought).

# TABLE OF CONTENTS

I.  INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . 1

II.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  THE 2009 FOUNDING OF STEM. . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.  THE "2010 EMPLOYMENT DISPUTE" . . . . . . . . . . . . . . . . . . . . . 3

    C.  STEM PURCHASES D&O INSURANCE FROM SCOTTSDALE . . . 4

    D.  THE TWO SCOTTSDALE POLICIES AT ISSUE . . . . . . . . . . . . . . 5

    E.  THE 2013 SERIES B FINANCING . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    F.  TROUBLE BREWING OVER THE SERIES B FINANCING. . . . . . 6

    G.  STEM GIVES NOTICE TO SCOTTSDALE PURSUANT TO
       THE 2013-2014 POLICY'S "AWARENESS PROVISION" . . . . . . . 7

    H.  THE BUZBY LOAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.  THE 2017 SHAREHOLDER LAWSUIT . . . . . . . . . . . . . . . . . . . . . 8

    J.  TENDER AND DENIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    K.  THE INSTANT LAWSUIT AGAINST SCOTTSDALE . . . . . . . . . . 9

III.  LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.  PRINCIPLES GOVERNING THE DUTY TO DEFEND
       AND BURDEN OF PROOF ON SUMMARY JUDGMENT. . . . . . . 9

    B.  THE 2017 SHAREHOLDER LAWSUIT ASSERTS
       *TWO* "CLAIMS" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

C.     THE SERIES B FINANCING CLAIM TRIGGERS
THE 2013-2014 POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

D.     THE BUZBY LOAN CLAIM TRIGGERS
THE 2016-2017 POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

E.     STEM MEETS ITS INITIAL BURDEN OF PROVING THE
EXISTENCE OF POTENTIAL COVERAGE UNDER BOTH
POLICIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

F.     THE COVERAGE DEFENSES ASSERTED IN SCOTTSDALE'S
DENIAL LETTER LACK MERIT . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
1. The "Interrelated Wrongful Acts" Provision . . . . . . . . . . . . . . . . . 13
2. The Insured vs. Insured Exclusion . . . . . . . . . . . . . . . . . . . . . . . . 14
3. The Prior & Pending Exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . 15

G.     SCOTTSDALE'S "NON-DISCLOSURE" DEFENSE ALSO FAILS  16
1. Stem's "No" Response To Question IV-1 Was Correct . . . . . . . . . . 16
2. Scottsdale Has Limited its Remedies for a Misrepresentation or
Omission in the Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# **TABLE OF AUTHORITIES**

**Federal Cases**

*Anthem Elecs., Inc. v. Pacific Employers Ins. Co.,*
    302 F.3d 1049 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Align Tech., Inc. v. Fed. Ins. Co.,*
    673 F. Supp.2d 957 (N.D. Cal. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Tapestry v. Liberty Ins. Underwriters,*
    2020 U.S. Dist. LEXIS 142858 (D. Ariz. Feb. 13, 2020) . . . . . . . . . . . . . . 10

*Church Mut. Ins. Co. v. United States Liab. Ins. Co.,*
    347 F. Supp. 2d 880 (S.D. Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

*SDR Capital Mgmt. V. Am. Int'l Speciality Lines Ins. Co.,*
    320 F. Supp. 2d 1043 (S.D. Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**State Cases**

*Montrose Chem. Corp. v. Superior Court,*
    6 Cal.4th 287 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.,*
    5 Cal.4th 854 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 14

*Health Net, Inc. v. RLI Ins. Co.,*
    206 Cal.App. 4th 232 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Atlantic Mut. Ins. Co. v. J. Lamb, Inc.,*
    100 Cal.App.4th 1017 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Federal Statues**

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Other**

*California Practice Guide: Insurance Litigation*
    Hon. H. Walter Croskey, et al., (The Rutter Group 2020) . . . . . . . . . . . 14, 15

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Three of Stem's directors, Messrs. Zeb Rice, John Carrington and David Buzby, are named defendants in the 2017 Shareholder Lawsuit pending in San Mateo County Superior Court. These directors are alleged to have breached fiduciary duties owed to the underlying plaintiffs with respect to *two* separate and unrelated financial transactions that occurred at Stem, one in 2013 involving a Series B Financing, and the other in 2017 involving a loan that was made to Stem by Mr. Buzby.

Scottsdale, Stem's D&O insurer, has breached the defense obligations it owes to the three directors under two of its policies. The 2013-2014 Policy is triggered by the claim involving the 2013 Series B Financing transaction; and the 2016-2017 Policy is triggered by the separate and unrelated claim involving the 2017 Buzby loan transaction.

In Scottsdale's July 27, 2017 coverage denial letter, it represented to Stem that three coverage defenses excuse its defense obligations. However, none of these defenses has merit. Each of these three defenses turns on the same issue: Whether there exists a material overlap between the claims asserted against Stem's directors in the 2017 Shareholder Lawsuit, and an earlier employment dispute between one of the underlying plaintiffs, Stacey Reineccius, and Stem, which was fully settled on March 28, 2011 (the "2010 Employment Dispute").

Scottsdale insists that such a material overlap does exist, and that it is fatal to Stem's insurance claim. As evidence for this, Scottsdale points to certain background recitations made in the 2017 Shareholder Lawsuit. For example, Scottsdale contends the claims asserted against Stem's directors in the 2017 Shareholder Lawsuit on the one hand, and the 2010 Employment Dispute on the other hand, should be *deemed* a "single Claim" first made at the time of the 2010 Employment Dispute, which predated the first policy it issued to Stem on October 13, 2011. Scottsdale also argues the purported material overlap between the claims asserted in the 2017 Shareholder Lawsuit and the

2010 Employment Dispute implicate its policy's "Insured vs. Insured Exclusion" and "Prior & Pending Exclusion."

Stem strongly disagrees. The wrongful acts alleged against its directors in the 2017 Shareholder Lawsuit arise *exclusively* out of certain financial transactions that occurred at the company in 2013 and 2017. Discussion of the 2010 Employment Dispute, *a dispute that was fully settled in 2011*, is included in the 2017 Shareholder Lawsuit for background, and perhaps to try and portray Stem and its directors in a negative light.

Stem is not alone in this view. The plaintiffs in the 2017 Shareholder Lawsuit also expressly acknowledge that the 2010 Employment Dispute is *not* material to their claims. They aver in another pleading they filed in the 2017 Shareholder Lawsuit that their litigation *"arises out of events in 2013."* They further aver that Mr. Reineccius' employment claims were fully settled *"and are not before this court."*

Moreover, this Court has already rejected Scottsdale's contention that a material overlap exists. In its July 20, 2020 Order denying Scottsdale's Motion to Dismiss, wherein Scottsdale argued the Insured v Insured Exclusion was implicated by the 2010 Employment Dispute, the Court ruled:

> [D]iscussion of events that occurred in 2010 in the Underlying Complaint is merely intended to provide background . . . [t]he claims in the Underlying Lawsuit **are based solely** on alleged wrongful acts that occurred after Reineccius's termination in 2010.

(Emphasis added.)

This ruling by the Court takes the legs out from under the coverage defenses asserted by Scottsdale in its denial letter. The Court's ruling is also determinative of another coverage defense Scottsdale has raised during this coverage litigation. In this regard, Scottsdale contends that Stem failed to disclose the 2010 Employment Dispute in its original 2011 application for D&O insurance. Stem disputes this contention on three independent grounds. First, Stem accurately answered all of the questions asked on the 2011 application. Second, the at-issue 2013-2014 Policy and 2016-2017 Policy both

include a definition of "Application" that does not encompass the 2011 original application. And third, the Scottsdale policies all include an endorsement waiving Scottsdale's rescission rights, and providing instead that any claim arising out of or involving any untruthful or inaccurate representation will be excluded from coverage. Even assuming Scottsdale could prove this exclusionary language applies, which Stem disputes, it would not operate to bar coverage since the claims in the 2017 Shareholder Lawsuit *do not* arise out of, or involve, the 2010 Employment Dispute.

In sum, *two* of Scottsdale's policies are potentially implicated by the claims asserted in the 2017 Shareholder Lawsuit, and Scottsdale is unable to carry its heavy burden under California law of showing a policy exclusion or other limitation eliminates the potential for covered liability.

## II.

## STATEMENT OF FACTS

### A.    THE 2009 FOUNDING OF STEM

Stem was founded in 2009 as a clean energy startup devoted to developing energy storage systems for businesses. Stem was founded by Brian Thompson and Stacey Reineccius.[2] Declaration of Brian Thompson ("Thompson Decl."), ¶2.

### B.    THE "2010 EMPLOYMENT DISPUTE"

On September 22, 2010, Stem's board of directors terminated Mr. Reineccius' employment for "cause" on the ground he had "engaged in knowing and intentional misconduct that was, is or is reasonably likely to be materially injurious to the Company." Following Mr. Reineccius' termination for "cause," and pursuant to the terms of two Restricted Stock Purchase Agreements, Stem exercised its option to repurchase 5,093,055 shares of *un-vested* stock from Mr. Reineccius, which left him

/ / /

---

[2]    The company was originally called "Powergetics, Inc.," but in April 2012 it changed its name to "Stem, Inc." Thompson Decl., ¶3. For ease of reference, the company will be referred to herein as "Stem," even when describing events occurring before the name change.

with 7,456,945 of *vested* stock. On October 28, 2010, Mr. Reineccius was also removed from the company's board of directors. Thompson Decl., ¶¶4-12.

Mr. Reineccius disputed his termination and Stem's repurchase of his un-vested shares. He retained three lawyers, Jonathan Gaskin, Richard Grimm, and Gregory Klingsporn, to represent him. Thompson Decl., ¶10-11.

The risk of potential litigation with one of its founders hindered Stem's efforts to attract new investors. To resolve this impasse, on February 8, 2011, Stem filed a demand for arbitration with JAMS, naming Mr. Reineccius as respondent, and seeking an order that his termination was proper. Thompson Decl., ¶¶14-15; Arbitration Demand, Exh. "J"; Arbitration Statement, Exh. "K."

On March 28, 2011, Stem and Mr. Reineccius entered into a settlement agreement to resolve their disputes (the "2011 Settlement Agreement"). Thompson Decl., ¶16; 2011 Settlement Agreement, Exh. "L." Pursuant to the terms of the 2011 Settlement Agreement, Mr. Reineccius (on behalf of himself, his family members, and his agents) released any and all claims against the company (as well as its officers, directors, and shareholders) "arising from any omissions, acts, facts or damages that have occurred up until and including the Effective Date [*i.e.*, March 28, 2011] of this Agreement." Exh. "L" at 258.

The 2011 Settlement Agreement effectively "wiped the slate clean." Any claims that Mr. Reineccius believed he might have had based on wrongful acts prior to March 28, 2011 were *fully and finally resolved*.

## C.   STEM PURCHASES D&O INSURANCE FROM SCOTTSDALE

On September 13, 2011, Stem submitted to Scottsdale a signed application for D&O insurance. One month later, Scottsdale issued a "Business and Management Indemnity" policy to Stem, designated by policy number EKS3049560, for the policy period of October 13, 2011 to October 13, 2012 (the "2011-2012 Policy"). Thompson Decl., ¶18-19.

/ / /

The 2011-2012 Policy was the first of eight consecutive "Business and Management Indemnity" policies that Scottsdale issued to Stem annually from October 13, 2011 to October 27, 2019. Declaration of Gary Osborne ("Osborne Decl."), ¶¶8-9; List of Policies, Exh. "N."

## D. THE TWO SCOTTSDALE POLICIES AT ISSUE

Two of these Scottsdale policies are at issue in this coverage action. The first is the 2013-2014 Policy, having a policy period of October 27, 2013 to October 27, 2014; and the second is the 2016-2017 Policy, having a policy period of October 27, 2016 to October 27, 2017. Osborne Decl., ¶10, 2013-2014 Policy, Exh. "A"; 2016-2017 Policy, Exh. "B."

Both policies include an insuring clause which reads, in relevant part, as follows:

> The **Insurer** shall pay the **Loss** of the **Company** for which the **Company** has indemnified the **Directors and Officers** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against [them] during the **Policy Period** . . . and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

Exh. "A" at 12; Exh. "B" at 63.

The policies both define "**Loss**" to include legal fees, expenses, and settlements. The term "**Company**" is defined to mean Stem. "**Directors and Officers**" is a phrase defined to include "any person who was, now is, or shall become: . . . a duly elected or appointed director, officer, or similar executive of the **Company**, or any member of the management board of the **Company**." "**Claim**" is defined to include, among other things, "a written demand . . . for monetary damages . . .," and "a civil proceeding . . . seeking monetary damages . . . ." "**Wrongful Act**" is defined broadly to include any "error," "omission," "breach of duty" or "act" by the "**Directors and Officers**" while acting in their capacity as such. Exh. "A" at 7-8, 12-14; Exh. "B" at 58-59, 63-65.

## E. THE 2013 SERIES B FINANCING

In November 2013, during the term of the 2013-2014 Policy, the Angeleno Group agreed to step in and serve as the lead investor in a Series B Financing on condition that

1 this financing include a 100:1 pull forward provision. The pull forward provision
2 worked as follows: if a Stem investor participated in the Series B Financing at the
3 threshold amount of 67% of their pro rata ownership percentage, then that shareholder
4 would receive 100 shares of Stem stock in exchange for each one of its existing shares.
5 If, on the other hand, a shareholder chose not to participate in the Series B Financing at
6 the threshold level, then its interest in the company would be diluted.[3] Declaration of
7 David Buzby ("Buzby Decl."), ¶¶2-3.

8 On November 14, 2013, the Stem Board of Directors voted 3-0 in favor of
9 accepting the Series B Financing on the terms offered by the Angeleno Group, including
10 the required pull forward provision. Buzby Decl., ¶4. All Stem shareholders were
11 offered a chance to participate. Declaration of John Carrington ("Carrington Decl."),
12 ¶¶2-3.

13 **F.**   **TROUBLE BREWING OVER THE SERIES B FINANCING**

14 A few weeks later, on December 31, 2013, Stem received a letter from Richard
15 Grimm seeking information that would allow him to plead particularized facts if he were
16 to pursue litigation against the company, or any of its officers or board members, *in*
17 *connection with the Series B Financing*. Carrington Decl., ¶4; Grimm Letter, Exh. "O."
18 In response, Stem offered to provide certain documents under a confidentiality
19 agreement, but Mr. Grimm did not accept this offer. Carrington Decl., ¶5. Instead, on
20 February 5, 2014, Mr. Grimm filed a lawsuit against Stem in the Delaware Court of
21 Chancery seeking an order requiring Stem to produce the documents he had requested.
22 Carrington Decl., ¶6; Grimm Complaint, Exh. "P." On October 13, 2014, the assigned
23 Master in Chancery issued a "Final Report," and Stem was required to produce some
24 documents, but not others. Carrington Decl., ¶¶7-8; Final Report, Exh. "Q."

25 / / /

26 / / /

---

27   
28 [3]   Such pull forward provisions are common in venture capital financings to incentivize participation by existing investors. Buzby Decl., ¶2.

## G. STEM GIVES NOTICE TO SCOTTSDALE PURSUANT TO THE 2013-2014 POLICY'S "AWARENESS PROVISION"

On October 17, 2014, Stem's insurance broker triggered the Awareness Provision in the 2013-2014 Policy by providing written notice of circumstances ("NOC") to Scottsdale regarding Mr. Grimm's December 31, 2013 letter, the February 2014 Delaware Lawsuit, and the October 13, 2014 "Final Report." Osborne Decl., ¶12; Stem's NOC, Exh. "R."[4]

On January 23, 2015, Scottsdale responded in writing by acknowledging receipt of Stem's notice, and stating: "We understand that this matter did not mature into a **Claim**." It also stated, "We will, however, treat this matter as a notice of facts or circumstances which may reasonably give rise to a future **Claim** . . . ." Osborne Decl., ¶14; Stem's NOC, Exh. "S" at 315-316.

## H. THE BUZBY LOAN

In January 2017, Stem had recently won a contract with Southern California Edison, which was a critical milestone for the company's success. The terms required Stem to have a "letter of credit" to demonstrate it had sufficient financial resources to back its ability to perform. When Stem's bank refused to provide this letter of credit, Mr. Buzby loaned the company the necessary $1.5 million (the "Buzby Loan") to enable it to keep this important contract. Osborne Decl., ¶18; Buzby Deposition Excerpts, Exh. "W" at 384-386.

///

///

///

---

[4]    Scottsdale's policies, like virtually all claims-made policies, include what is often called an "Awareness Provision." The provision permitted Stem to "lock in" coverage under a particular policy by giving written notice to Scottsdale, during the policy period, "of specific facts or circumstances which may reasonably give rise to a future **Claim** covered under this **Policy**." Provided such a notice is given, the Awareness Provision provides that "any **Claim** made subsequently <u>arising out of such facts or circumstances</u> shall be deemed for the purposes of this Coverage Section to have been made at the time such notices [sic] was received by the **Insurer**." Osborne Decl., ¶13; Exh. "A" at 22. (Underscore added.)

## I.  THE 2017 SHAREHOLDER LAWSUIT

On May 12, 2017, four of Stem's shareholders, Mr. Reineccius, Mr. Grimm, Mr. Klingsporn and Brenda Berlin, filed the 2017 Shareholder Lawsuit.  Carrington Decl., ¶9; Complaint in the 2017 Shareholder Lawsuit, Exh. "C."

Stem is not named as a defendant in the 2017 Shareholder Lawsuit.  Among the five named defendants, however, three qualify as insureds under Scottsdale's policies.  These insured defendants are Zeb Rice, John Carrington and David Buzby, all of whom are now, or were at the time, members of Stem's board of directors.  Osborne Decl., ¶¶2-3; Exh. "C" at 98 and 100-101.

The 2017 Shareholder Lawsuit asserts causes of action for Breach of Fiduciary Duty, Conspiracy and Unjust Enrichment, premised *entirely* upon two financial transactions that took place in 2013 and 2017.  One claim is based on alleged wrongful acts in connection with the 2013 Series B Financing and its 100:1 pull forward provision, which diluted the value of the underlying plaintiffs' stock holdings.

The other claim is based on allegations pertaining to the 2017 Buzby Loan.  Specifically, under the heading entitled, "Defendant Buzby's Windfall," the plaintiffs alleged the following:

> 79.  In 2017, Defendant Buzby extended a short-term loan to STEM in the amount of $1,500,000.  One month later the "loan" was paid in full and Buzby received cash and stock worth over $2 million.  The Buzby transaction constitutes self-dealing *and is a separate breach of his fiduciary duty to Plaintiffs*.

Exh. "C" at 111-112, ¶79 (italics added).

## J.  TENDER AND DENIAL

On June 2, 2017, Stem tendered the 2017 Shareholder Lawsuit to Scottsdale seeking a defense for its three directors.  Declaration of Bill Bush ("Bush Decl."), ¶4; Stem Tender, Exh. "D."  By letter dated July 27, 2017, Scottsdale denied it owed any defense obligations.  Bush Decl., ¶5; Scottsdale Denial, Exh. "E."

/ / /

/ / /

**K.    THE INSTANT LAWSUIT AGAINST SCOTTSDALE**

On April 29, 2020, Stem filed the instant lawsuit against Scottsdale. Osborne Decl., ¶6; Stem Complaint, Exh. "F." Scottsdale responded initially by filing a Motion to Dismiss. Osborne Decl., ¶7.

One of the issues litigated in connection with Scottsdale's Motion to Dismiss was whether Exception iv to the Insured vs. Insured Exclusion applied. This issue turned upon whether the claims in the 2017 Shareholder Lawsuit are "'solely based upon and arising out of Wrongful Acts committed subsequent to the date' Reineccius ceased to be a member of Stem's Board of Directors: October 28, 2010." Osborne Decl., ¶7; Judge Breyer's July 20, 2020 Order, Exh. "G" at 145.

On July 20, 2020, this Court denied Scottsdale's motion finding that "any claims that Reineccius might have had based on wrongful acts prior to March 28, 2011, **were fully and finally resolved** by the [2011] Settlement Agreement and thus cannot have been the basis of the claims he asserted six years later in the Underlying Lawsuit." Exh. "G" at 146. (Emphasis added.) The Court further ruled that "[t]he claims in the Underlying Lawsuit **are based solely on** alleged wrongful acts that occurred after Reineccius's termination in 2010 . . . ." *Id.* (Emphasis added.)

**III.**

**LEGAL ARGUMENT**

**A.    PRINCIPLES GOVERNING THE DUTY TO DEFEND AND BURDEN OF PROOF ON SUMMARY JUDGMENT**

The California Supreme Court has underscored repeatedly that an insurer's duty to defend is a heavy responsibility, one that will only be excused if a claim *"can by no conceivable theory raise a single issue which could bring it within the policy coverage."* *Montrose Chem. Corp. v. Superior Court*, 6 Cal.4th 287, 300 (1993) (italics in original); *see also Anthem Elecs., Inc. v. Pacific Employers Ins. Co.*, 302 F.3d 1049, 1054 (9th Cir. 2002) ("An insurer has a very broad duty to defend its insured under California law."); *Align Tech., Inc. v. Fed. Ins. Co.*, 673 F.Supp.2d 957, 967 (N.D. Cal. 2009) ("To trigger

the defense duty, there need be nothing more than a 'bare potential or possibility of coverage.'") (citing *Montrose, supra*).

Whether an insurer owes a defense obligation is a matter of law appropriate for summary judgment. *See Montrose, supra*, 6 Cal.4th at 301. The insurer's broad duty shapes each party's burden of proof: "To prevail, the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential*. In other words, the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it *cannot*." *Id.* at 300 (italics in original). Any doubt as to whether the facts establish a defense obligation, "must be resolved in the insured's favor." *Id.* at 299-300.

**B.    THE 2017 SHAREHOLDER LAWSUIT ASSERTS *TWO* "CLAIMS"**

The Scottsdale policies define "**Claim**," in relevant part, as follows:

> **Claim** means:
>
> a.    a written demand against any **Insured** for monetary damages or non-monetary or injunctive relief; [or]
>
> * * *
>
> c.    a civil proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading;

Exh. "A" at 12; Exh. "B" at 63.

These two **"Claim"** definitions are *not* mutually exclusive. Where a lawsuit includes multiple unrelated claims for relief, each one should be treated as a separate **"Claim."** *See Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.*, 5 Cal.4th 854, 859 (1993) ("We agree with the Court of Appeal's view that including multiple claims within a single action does not render them a single claim."); *Health Net, Inc. v. RLI Ins. Co.*, 206 Cal.App.4th 232, 238, n.2 (2012) ("we necessarily conclude that the word 'Claim' in the policy refers to a claim for relief in an underlying lawsuit, rather than the entire lawsuit."); *Tapestry v. Liberty Ins. Underwriters*, No. CV-18-04857-PHX-JJT, 2020 U.S. Dist. LEXIS 142858, *13 (D. Ariz. Feb. 13, 2020)

1  ("while it is true that an entire judicial proceeding can constitute a Claim, it can also be

2  true that written demands for monetary relief within a lawsuit can also be Claims.").

3      Stem submits that under subsection a. of the definition of "**Claim**," the 2017

4  Shareholder Lawsuit asserts *two* separate and unrelated **"Claims"** against Stem's

5  directors.  One being a "written demand . . . for monetary damages" in connection with

6  the 2013 Series B Financing (the "Series B Financing Claim"), and the other being a

7  "written demand . . . for monetary damages" in connection with the 2017 Buzby Loan

8  (the "Buzby Loan Claim").  *See, e.g., Tapestry, supra.*  Each constitutes an independent

9  claim for relief, based on distinct financial transactions occurring years apart, and

10  concerning the violation of separate primary rights.  *See Bay Cities, supra*, 5 Cal.4th at

11  560 ("California has consistently applied the 'primary rights' theory, under which the

12  invasion of one primary right gives rise to a single cause of action.").

13  **C.    THE SERIES B FINANCING CLAIM TRIGGERS THE 2013-2014**

14  **POLICY**

15      Although the 2017 Shareholder Lawsuit was filed on May 12, 2017, during the

16  term of the 2016-2017 Policy, the Series B Financing Claim is *"deemed"* to have been

17  first made during the term of the 2013-2014 Policy pursuant to that policy's Awareness

18  Provision.  As discussed *supra*, on October 17, 2014, Stem's insurance broker provided

19  Scottsdale with a notice of circumstances.  This notice consisted of certain documents

20  reflecting Mr. Grimm's efforts to obtain information to plead particularized facts if he

21  were to pursue litigation against Stem, or any of its officers or board members, in

22  connection with the Series B Financing.  Exh. "R."  Stem's submission of this notice of

23  circumstances triggered the 2013-2014 Policy's Awareness Provision, that provides, in

24  relevant part:

25          any **Claim** made subsequently *arising out of* such facts or
           circumstances shall be deemed . . . to have been made at the time
26          such notices [sic] was received by the **Insurer**.

27  Exh. "A" at 22.  (Italics added.)

28  / / /

1      Accordingly, the Series B Financing Claim in the 2017 Shareholder Lawsuit, that

2 arises out of the facts or circumstances that Stem's insurance broker noticed to

3 Scottsdale on October 17, 2013, is *"deemed"* to have been made during the term of the

4 2013-2014 Policy.

**D.**     <u>**THE BUZBY LOAN CLAIM TRIGGERS THE 2016-2017 POLICY**</u>

6      Any contention that the Buzby Loan Claim should also be "deemed" made during

7 the 2013-2014 Policy should be soundly rejected. The Buzby Loan Claim did not arise

8 out of Stem's October 17, 2013 notice of facts or circumstances which concerned *only*

9 the 2013 Series B Financing transaction. Furthermore, the Buzby Loan Claim and the

10 Series B Financing Claim are not related to one another. They are **"Claims"** arising

11 from separate transactions occurring three years apart.

12      The Buzby Loan Claim was "first made" against Stem's directors when the 2017

13 Shareholder Lawsuit was filed on May 12, 2017, *i.e.*, during the term of the 2016-2017

14 Policy. Furthermore, Stem timely reported this **"Claim"** to Scottsdale on June 2, 2017,

15 in accordance with that Policy's [Section E. 1.] notice provision. Exh. "B" at 69. It is a

16 **"Claim"** triggering the 2016-2017 Policy.

**E.**     <u>**STEM MEETS ITS INITIAL BURDEN OF PROVING THE EXISTENCE**</u>

18      <u>**OF POTENTIAL COVERAGE UNDER BOTH POLICIES**</u>

19      The discussion *supra* focuses on which policies are implicated based on the

20 *timing* of when the **"Claims"** in the 2017 Shareholder Lawsuit were either first made, or

21 deemed first made. For the reasons stated, Stem submits that both the 2013-2014 Policy

22 and the 2016-2017 Policy are implicated, the former by the Series B Financing Claim

23 and the latter by the Buzby Loan Claim.

24      Stem also has the burden of proving the existence of a potential for coverage

25 under the insuring provisions of these two policies. *See Montrose, supra* ("the insured

26 must prove the existence of a *potential for coverage*"). Stem can meet this burden. It is

27 undisputed it has incurred **"Loss"** (*i.e.*, legal fees and expenses) defending its three

28 directors against both the Series B Financing Claim and the Buzby Loan Claim. It is

further undisputed that the directors are accused of **Wrongful Acts** (*i.e.*, breach of [fiduciary] duty) with respect to both of these **"Claims."**

In sum, Stem carries its threshold burden of proving a "potential" for covered liability under the insuring provisions of both the 2013-2014 Policy and the 2016-2017 Policy.

## F. THE COVERAGE DEFENSES ASSERTED IN SCOTTSDALE'S DENIAL LETTER LACK MERIT

Scottsdale asserted in its denial letter three grounds for denying it owes a defense obligation. Stem will address each in turn.

### 1. The "Interrelated Wrongful Acts" Provision

Based upon an "Interrelated Wrongful Acts" provision in its policies, Scottsdale contends the **"Claims"** in the 2017 Shareholder Lawsuit should be "deemed" to have been made at the time of the 2010 Employment Dispute.

This "Interrelated Wrongful Acts" provision is found at Section D.3 of the policies, and reads in relevant part as follows:

> All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the **Policy Period**:
>
> a.    the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful ct** is first made[.]

Exh. "A" at 18; Exh. "B" at 68-69.

For this "Interrelated Wrongful Acts" provision to apply, Scottsdale must prove a "common nexus" between the **"Wrongful Acts"** underpinning both the Series B Financing Claim and the Buzby Loan Claim on the one hand, and the **"Wrongful Acts"** underpinning the 2010 Employment Dispute on the other.[5]  However, as this Court has

---

[5]    The phrase **"Interrelated Wrongful Acts"** is defined by Scottsdale's policies to mean "all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes."

already held, no such nexus exists. The 2010 Employment Dispute arose out of Mr. Reineccius' "for cause" termination from Stem. The **"Claims"** in the 2017 Shareholder Lawsuit, in contrast, concern alleged breaches of fiduciary duty in connection with two financial transaction occurring at Stem in 2013 and 2017, *i.e.*, several years after Mr. Reineccius' termination.

In all material respects, the **"Wrongful Acts"** underpinning the Series B Financing Claim and the Buzby Loan Claim are distinct – temporally, logically and causally – from the 2010 Employment Dispute. *See* Court's July 20, 2020 Order, Exh. "G" at 146 ("[t]he claims in the Underlying Lawsuit *are based solely on alleged wrongful acts that occurred after Reineccius's termination in 2010*.") (italics added); *see also Bay Cities Pavings & Grading, supra*, at 873 (claims not related when their relationship is "so attenuated or unusual that an objectively reasonable insured could not have expected they would be treated as a single claim under the policy.").

Scottsdale cannot carry its burden of showing the "Interrelated Wrongful Acts" provision eliminates a potential for covered liability. *See Croskey, et al.*, Cal. Prac. Guide: Insurance Litigation, § 7:82.3 (The Rutter Group 2020) ("The burden is on the insurer to show that wrongful acts during the policy period are 'related to' prior acts.").

2. <u>The Insured vs. Insured Exclusion</u>

This coverage defense has already been litigated by the parties, and ruled upon by the Court, in connection with Scottsdale's Motion to Dismiss. Exh. "G" at 144-146. In concluding that Exception iv. to the Insured vs. Insured Exclusion applied – an issue that turned upon whether the **"Claims"** in the 2017 Shareholder Lawsuit arise out **"Wrongful Acts"** committed after Mr. Reineccius' termination from Stem – the Court noted that "any claims that Reineccius might have had based on wrongful acts prior to March 28, 2011, **<u>were fully and finally resolved by the [2011] Settlement Agreement</u>**

/ / /

---

Exh. "A" at 13; Exh. "B" at 64.

**and thus cannot have been the basis of the claims he asserted six years later in the Underlying Lawsuit**." Exh. "G" at 146 (underscore and bolding added).

The Court then concluded its analysis of Exception iv with the following paragraph:

> The plaintiffs in the Underlying Lawsuit, including Reineccius, suggest as much in their "Opposition to Petition to Compel Arbitration," stating that "Reineccius'[s] claims arising out of [the employment dispute] . . . were resolved by the Settlement Agreement and are not before this Court" and that "[t]his [l]itigation [a]rises [o]ut of [e]vents in 2013." This supports the conclusion that discussion of events that occurred in 2010 in the Underlying Complaint is merely intended to provide background. **The claims in the Underlying Lawsuit are based solely on alleged wrongful acts that occurred after Reineccius's termination in 2010 and fall under Exception iv to the Insured v. Insured Exclusion**.

Exh. "G" at 146 (internal citations omitted, underscore and bolding added).[6]

Stem respectfully submits the Insured vs. Insured Exclusion does not eliminate the potential for covered liability.

### 3. The Prior & Pending Exclusion

Scottsdale also contends the 2010 Employment Dispute implicates a Prior & Pending Exclusion in its policies that bars coverage for any **"Claim"** arising out of, or involving, a prior demand letter that was pending on or before October 13, 2011. Exh. "A" at 16 (C. 1. k.); Exh. "B" at 67 (C. 1. k.).

Again, this contention cannot be squared with the Court's July 20, 2020 Order quoted in relevant part above. *See* Croskey, et al., Cal. Prac. Guide: Insurance Litigation, § 7:1704.2 (The Rutter Group 2020) ("The "prior litigation" exclusion has been held applicable where there was a *strong factual nexus* between a lawsuit for which the insured sought coverage and a prior lawsuit.") (italics in original); *see also Church Mut. Ins. Co. v. United States Liab. Ins. Co.*, 347 F. Supp. 2d 880, 890 (S.D. Cal. 2004)

---

[6]     The Court noted in its Order that because Exception iv. to the Insured vs. Insured Exclusion was satisfied, it was not necessary to analyze Stem's other argument that the policy's allocation provision would provide coverage for the claims of the three non-insured plaintiffs, Mr. Grimm, Mr. Klingsporn, and Ms. Berlin. Exh. "G" at 146.

("Pending or Prior Litigation Exclusion" inapplicable as the "gravamen" of the claim facing the insured was "fraud" in contrast to a prior claim that involved a "failure to pay for construction work").

## G. SCOTTSDALE'S "NON-DISCLOSURE" DEFENSE ALSO FAILS

In its discovery responses, Scottsdale contends it has an additional defense to coverage because Stem failed to disclose the 2010 Employment Dispute in response to Question IV-I on its original application for insurance (the "2011 Application"). Osborne Decl., ¶16; Scottsdale Response to Interrogatories, Exh. "U" at 329.

There is no merit to this contention. Stem responded accurately to all questions on the 2011 Application. Furthermore, as is common in D&O policies, the 2013-2014 Policy and the 2016-2017 Policy both place limits on the remedies available to Scottsdale in the event of a misrepresentation or omission.

### 1. Stem's "No" Response To Question IV-1 Was Correct

Question IV-1 on the 2011 Application read as follows:

> *Within the last three years, has any person or entity proposed for this insurance been the subject of or involved in any* litigation, administrative proceeding, *demand letter* or formal or informal governmental investigation of inquiry including any investigation by the Department of Labor or the Equal Employment Opportunity Commission. If yes, please provide details on a separate page.

☐ Yes      ☐ No

Exh. "M" at 277 (italics added).

Stem responded "No" to this question. Scottsdale argues three documents constitute "demand letters" that should have prompted Stem to respond "Yes" to Question IV-1, and to then "provide details [of the 2010 Employment Dispute] on a separate page." According to Scottsdale's discovery responses, these three documents are as follows: (1) a letter from Richard Grimm to Stem dated November 17, 2010; (2) a letter from Stacey Reineccius to Brian Thompson (Stem's CEO at the time) dated January 19, 2011; and (3) an arbitration filed by Stem, against Mr. Reineccius, in February 2011. Exh. "U" at 329.

Put simply, none of the above-referenced three documents are "demand letters." Black's Law Dictionary defines "demand letter" to mean a "letter by which one party explains its legal positions in a dispute and requests that the recipient take some action *or else risk being sued*." Black's Law Dictionary 462-463 (10th ed. 2014), Exh. "T" at 321. Neither of the two letters, nor the arbitration, meet this definition. The November 17, 2010 letter from Mr. Grimm merely requested an opportunity for Mr. Reineccius to review his personnel file and payroll records, and "a report from the Company indicating how, when, and why the Company had disclosed his protected medical information." Exh. "H" at 155. There is no explanation of a legal position, nor a threat that Stem would be sued if it did not provide the documents and information requested. As such, this letter was not a "demand letter."

The January 19, 2011 letter from Mr. Reineccius requested, pursuant to Section 220 of the Delaware General Corporation Law, that Stem make certain books and records available to him for inspection. Exh. "I" at 156. Mr. Reineccius explained, "[t]he purpose of my requested inspection is to determine the value of the Corporation's stock." *Id.* at 157. Although this letter describes Mr. Reineccius's legal right to inspect records, and requests documents he wants to inspect, it does not contain any "or else" threat of litigation if Stem were to fail to take the requested action. As such, it was not a "demand letter" either.

Finally, as for the arbitration Stem brought against Mr. Reineccius, seeking an order confirming his termination for "cause" had been proper, this was obviously not a "letter." While Question IV-1 does refer to "litigation," this would not encompass an "arbitration" given the clear distinction between the two. *See SDR Capital Mgmt. v. Am. Int'l Speciality Lines Ins. Co.*, 320 F. Supp. 2d 1043, 1048 (S.D. Cal. 2004)

/ / /

/ / /

/ / /

/ / /

("Arbitration is merely an alternative to litigation; *it is not itself litigation*.") (italics added.)[7]

Accordingly, Stem's "No" response to Question IV-1 on the 2011 Application was correct. In any event, even assuming *arguendo* Stem should have answered "Yes," and provided details about the 2010 Employment Dispute, Scottsdale's non-disclosure argument would still fail. As discussed below, Scottsdale has contractually limited its remedies in the event of a misrepresentation or omission in an application.

## 2. Scottsdale Has Limited its Remedies for a Misrepresentation or Omission in the Application

All of Stem's policies were issued with an endorsement titled "Amend Warranty Provision Non-Rescindable Coverage" (hereafter, "Amend Warranty" endorsement). This "Amend Warranty" endorsement is a coverage enhancement. It replaces the warranty condition in the main policy form, and imposes limits upon Scottsdale's remedies in the event of a material misrepresentation or omission.

As well as rendering the policy "non-rescindable," the Amend Warranty endorsement sets forth specific exclusionary language that will apply in the event of an intentional or material misrepresentation or omission. In relevant part, the endorsement's exclusionary language reads as follows:

> *In the event the **Application**, including materials submitted or required to be submitted therewith, contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by the **Insurer** under this **Policy**, this **Policy** . . . shall not afford coverage . . . for any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any untruthful or inaccurate statements, representations or information[.]*

(Italics added.)

_____

[7] Notably, a subsequent (2014) version of Scottsdale's application form was revised to require the disclosure of "arbitrations." Osborne Decl., ¶17; Scottsdale Application - 2014 version, Exh. "V" at 361. However, the older (2009) version of this application, the one Stem was asked to complete in 2011, did not.

According to its terms, for this exclusionary language to bar coverage, Scottsdale must present "conclusive evidence" that (1) the **"Application"** for the 2013-2014 Policy and/or the 2016-2017 Policy contained a misrepresentation or omission, and (2) the **"Claims"** in the 2017 Shareholder Lawsuit arise out of or in some way involve any untruthful or inaccurate statements, representations or information. *See Atlantic Mutual Ins. Co. v. J. Lamb, Inc.*, 100 Cal.App.4th 1017, 1038-1039 (2002) ("An insurer may rely on an exclusion to deny coverage only if it provides *conclusive evidence* demonstrating that the exclusion applies."). For the following two reasons, Scottsdale cannot meet its burden.

*First,* because the definition of the term **"Application"** in the 2013-2014 Policy and the 2016-2017 Policy *does not* encompass the 2011 Application. The term **"Application"** is defined in both policies, as follows:

> **Application** means all applications, including any attachments thereto, and all other information and materials submitted by or on behalf of the **Insureds** to the **Insurer** in connection with the **Insurer** underwriting this **Policy** *or any policy of which this Policy is a renewal or replacement*. All such applications, attachments, information, materials and documents are deemed attached to and incorporated into this **Policy**.

Thus, according to this definition, the term **"Application"** in the 2013-2014 Policy only encompasses material submitted in applying for the 2013-2014 Policy, or in applying for any policy of which it was a "renewal or replacement," *i.e.*, the policy in effect from 2012-2013. Likewise, the term **"Application"** in the 2016-2017 Policy only encompasses material submitted in applying for the 2016-2017 Policy, or in applying for any policy of which it was a "renewal or replacement," *i.e.*, the policy in effect from 2012-2013.[8]

In neither case does the definition of **"Application"** in the 2013-2014 Policy and the 2016-2017 Policy encompass the 2011 Application. Accordingly, Scottsdale cannot

---

[8] The respective declaration pages of the 2013-2014 Policy and the 2016-2017 Policy both clearly identified the expiring policy of which they were renewals. Exh. "A" at 1; Exh. "B" at 52; *see also* www.irmi.com/glossary (defining a "renewal policy" as "an insurance policy issued to replace an expiring policy.").

prove the exclusionary language in the Amend Warranty endorsement attached to these policies is triggered. *See Church Mut. Ins. Co. v. United States Liab. Ins. Co.*, 347 F. Supp. 2d 880, 886 (S.D. Cal. 2004) ("exclusions are strictly construed against the insurer.").[9]

*Second*, the above-quoted exclusionary language in the Amend Warranty endorsement would not ***in any event*** bar coverage for the **"Claims"** in the Underlying Lawsuit. When applicable, the exclusionary language bars coverage "for any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any untruthful or inaccurate statements, representations or information[.]" As discussed *supra*, the Court has already ruled in denying Scottsdale's Motion to Dismiss that "[t]he claims in the Underlying Lawsuit are based solely on alleged wrongful acts that occurred after Reineccius's termination in 2010 . . . ."

In sum, there is no merit to Scottsdale's contention that it can deny coverage for the **"Claims"** in the 2017 Shareholder Lawsuit because of a "non-disclosure" on the 2011 Application.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

---

[9]     There is no contention Stem made any material misrepresentation or omission in the renewal applications it submitted for the 2013-2014 Policy or 2016-2017 Policy.

**IV.**

**CONCLUSION**

For all of the reasons set forth above, Scottsdale has breached its defense obligations owed to the directors of Stem who are named as defendants in the 2017 Shareholder Lawsuit. Moreover, Scottsdale has breached its defense obligations under both the 2013-2014 Policy and the 2016-2017 Policy. Stem respectfully requests that this Court grant its motion for partial summary judgment.


DATED: March 25, 2021          OSBORNE & NESBITT LLP


                               By: /s/Gary W. Osborne
                                   Gary W. Osborne
                                   Attorney for Plaintiff, STEM, INC.