1  **Gary W. Osborne (Bar No. 145734)**
2  **Dominic S. Nesbitt (Bar No. 146590)**
3  OSBORNE & NESBITT LLP
   101 West Broadway, Suite 1330
4  San Diego, California 92101
   Phone: (619) 557-0343
5  Fax: (619) 557-0107
6  gosborne@onlawllp.com
   dnesbitt@onlawllp.com
7  Attorneys for Plaintiff, STEM, INC.

8              UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10  | STEM, INC., | CASE NO. 3:20-cv-02950-CRB |
11  | a Delaware Corporation, | |
12  | Plaintiff, | **DECLARATION OF BRIAN THOMPSON IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING SCOTTSDALE'S DEFENSE OBLIGATION** |
13  | vs. | |
14  | SCOTTSDALE INSURANCE COMPANY, an Ohio Corporation, | |
15  | | |
16  | Defendant. | Date:    April 29, 2021 |
17  | | Time:    10:00 a.m. CTRM:    6 |

18
19   I, Brian Thompson, declare as follows:

20       1.      I am one of the founders of Stem, Inc. ("Stem"). (Stem was originally

21   called Powergetics, Inc. until it changed its name in 2012. For the sake of

22   simplicity, I will refer to the company throughout this declaration as Stem, whether

23   before or after the name change.) I served as Stem's Chief Executive Officer

24   ("CEO") from approximately March 2009, when it was founded, until November

25   2012. I continue to be a shareholder of Stem. I submit this declaration in support of

26   Stem's Motion for Partial Summary Judgment.

27

28

DocuSign Envelope ID: 06998644-E95F-4623-B7E2-F201CC9A3426

2.    Stacey Reineccius and I founded Stem in or about March 2009 as a clean energy startup devoted to developing energy storage systems for businesses.

3.    The company was originally called "Powergetics, Inc.," but changed its name to "Stem, Inc.," in or about April 2012.

4.    In August 2010, a potential investor informed me that its investigation had revealed that Mr. Reineccius was misrepresenting his academic background, and events which led to him having a $1.025 million tax lien imposed on him.

5.    Regarding his academic background, Mr. Reineccius had represented to me, to Stem's investors, and to Stem's potential investors that he had earned a B.A. degree in Computer Science from the University of California at Berkeley ("Berkeley").  On the contrary, however, in September 2010, I discovered that Mr. Reineccius had in fact *dropped out* of Berkeley after his second year there.

6.    Regarding the $1.025 million tax lien which had been imposed on Mr. Reineccius by the IRS for the failure of one of his prior companies, Quicknet Technologies, Inc., to pay its payroll taxes, Mr. Reineccius had represented to me that, despite being the CEO of Quicknet, he had had no knowledge of, nor any participation in, the decision at Quicknet to stop its payment of payroll taxes. On the contrary, however, in September 2011, I discovered that after Quicknet's CFO had been dismissed for failing to pay the company's payroll taxes, Mr. Reineccius *knowingly continued* this practice.

7.    In essence, these misrepresentations meant that Mr. Reineccius would no longer have any credibility with Silicon Valley investors, and that so long as he was associated with Stem, the company would be unable to raise the additional capital necessary for its continued existence.  In other words, this development posed an existential threat to Stem.

8.    As a result, on September 22, 2010, I and the Stem board of directors terminated Mr. Reineccius' employment for "cause" on the ground he had

DocuSign Envelope ID: 06998644-E95F-4623-B7E2-F201CC9A3426

1  "engaged in knowing and intentional misconduct that was, is or is reasonably

2  likely to be materially injurious to the Company."

3      9.      Subsequently, pursuant to the terms of two Restricted Stock Purchase

4  Agreements, Stem exercised its option to repurchase 5,093,055 shares of *un-vested*

5  stock from Mr. Reineccius, which left him 7,456,945 shares of *vested* stock.

6      10.     Mr. Reineccius disputed that his termination was for "cause," and that

7  Stem had the right to repurchase his un-vested shares (the "2010 Employment

8  Dispute").

9      11.     Mr. Reineccius hired three lawyers – Jonathan Gaskin, Richard

10  Grimm, and Gregory Klingsporn – to represent him in connection with the 2010

11  Employment Dispute.

12      12.     On October 28, 2010, Mr. Reineccius was removed from Stem's

13  board of directors.

14      13.     I received a letter from Mr. Reineccius to me dated January 19, 2011

15  requesting, pursuant to Section 220 of the Delaware General Corporation Law, that

16  Stem make certain books and records available to him for inspection.  Mr.

17  Reineccius explained, "[t]he purpose of my requested inspection is to determine

18  the value of the Corporation's stock." A true and correct copy of Mr. Reineccius's

19  January 19, 2011 letter to me is attached to the separately bound exhibits as Exhibit

20  "I."

21      14.     The risk of potential litigation with one of its founders further

22  hindered Stem's efforts to attract new investors.

23      15.     To resolve this impasse, on February 8, 2011, Stem filed a demand for

24  arbitration with JAMS, naming Mr. Reineccius as respondent, and seeking an order

25  that his termination for "cause" was proper.  A true and correct copy of Stem's

26  "Demand for Arbitration," dated February 8, 2011, is attached to the separately

27

1  bound exhibits as Exhibit "J." A true and correct copy of Stem's "Arbitration

2  Statement of Claims" is attached to the separately bound exhibits as Exhibit "K."

3       16.    On March 28, 2011, Stem and Mr. Reineccius entered into a

4  settlement agreement to resolve their disputes (the "2011 Settlement Agreement").

5  A true and correct copy of the 2011 Settlement Agreement is attached to the

6  separately bound exhibits as Exhibit "L."

7       17.    In August 2011 (i.e., five months after the 2011 Settlement

8  Agreement with Reineccius), Stem was able to secure a $6,000,000.00 investment

9  from a venture capital firm called "Angeleno Group" (the "Series A Financing").

10  As a condition of the Series A Financing, it was agreed that Angeleno's

11  representative, Zeb Rice, would join myself and David Buzby on Stem's board of

12  directors, and that Stem would purchase a D&O insurance policy.

13       18.    On September 13, 2011, Stem submitted a signed application to

14  Scottsdale for a "Business and Management Indemnity" policy (the "2011

15  Application"). A true and correct copy of the 2011 Application is attached to the

16  separately bound exhibits as Exhibit "M."

17       19.    In response, Scottsdale issued Stem its first D&O Policy, designated

18  by policy number EKS3049560, for the policy period from October 13, 2011 to

19  October 13, 2012 (the "2011-2012 Policy").

20       I declare under penalty of perjury under the laws of the United States

21  of America that the above statements are true and correct.

22

23  DATED: March 25, 2021



Brian Thompson

24

25

26

27

28