**Gary W. Osborne (Bar No. 145734)**
**Dominic S. Nesbitt (Bar No. 146590)**
OSBORNE & NESBITT LLP
101 West Broadway, Suite 1330
San Diego, California 92101
Phone: (619) 557-0343
Fax: (619) 557-0107
gosborne@onlawllp.com
dnesbitt@onlawllp.com

Attorneys for Plaintiff, STEM, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEM, INC.,<br>a Delaware Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SCOTTSDALE INSURANCE<br>COMPANY, an Ohio Corporation,<br><br>Defendant. | CASE NO. 3:20-cv-02950-CRB<br><br>Assigned to Honorable Charles R. Breyer<br><br>**REPLY IN SUPPORT OF PLAINTIFF STEM'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING DEFENDANT SCOTTSDALE'S DEFENSE OBLIGATIONS**<br><br>Date:      April 29, 2021<br>Time:     10:00 a.m.<br>CTRM:   6 |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# TABLE OF CONTENTS

I.    INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.   BURDEN OF PROOF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

III.  STEM'S DIRECTORS FACE *POTENTIAL* LIABILITY FOR *TWO* CLAIMS
      TRIGGERING *TWO* POLICIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

      A.   The "Claim" Definition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

      B.   The "Interrelated Wrongful Acts" Argument . . . . . . . . . . . . . . . . . . . . .  3

IV.   THE "PRIOR & PENDING" ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

V.    THE "PRIOR KNOWLEDGE" ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . .  6

VI.   THE "WARRANTY CONDITIONS" ARGUMENT  . . . . . . . . . . . . . . . . . . .  7

VII.  THE "BUZBY LOAN" ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

VIII. THE INSURED VS. INSURED ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . .  11

IX.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

1

## <u>TABLE OF AUTHORITIES</u>

2
**<u>Federal Cases</u>**

3
4
*Tapestry v. Liberty Ins. Underwriters,*
    2020 U.S. Dist. LEXIS 142858 (D. Ariz. Feb. 13, 2020) . . . . . . . . . . . . . . . . . 3

5
**<u>State Cases</u>**

6
*AIU Ins. Co. v. Sup. Ct. (FMC Corp),*
    51 Cal. 3d 807 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

7
8
*Amato v. Mercury Cas. Co.,*
    18 Cal.App.4th 1784 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

9
*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.,*
    5 Cal.4th 854 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

10
*Montrose Chem. Corp. v. Superior Court,*
    6 Cal.4th 287 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

11
12
*Pardee Construction Co. v. Insurance Co. of the West,*
    77 Cal.App.4th 1340 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.

## INTRODUCTION

Stem has carried its burden of proving the ongoing 2017 Shareholder Lawsuit alleges *two* **"Claims,"** triggering *two* of Scottsdale's policies.  Despite unleashing a battery of coverage defenses, Scottsdale fails to disprove this potential.

Most of Scottsdale's defenses are premised on its contention that the **"Claims"** against Stem's directors arise out of, or involve, the 2010 Employment Dispute.  However, not even the underlying plaintiffs believe this to be true, and this Court has already found that discussion of the fully-settled 2010 Employment Dispute is "merely intended to provide background."  Scottsdale has failed to establish, conclusively or otherwise, that either of the two **"Claims"** in the 2017 Shareholder Lawsuit share operative facts with the 2010 Employment Dispute.

Scottsdale's other coverage defenses likewise lack merit.  For example, Scottsdale's contention that the Buzby Loan Claim does not expose Mr. Buzby to potential liability in his covered capacity as a Stem director simply misconstrues the allegations made against him.  Scottsdale's breach of warranty argument fails for any one of three independent reasons.

Stem has already addressed Scottsdale's coverage defenses in Stem's motion, as well as in Stem's opposition to Scottsdale's cross-motion.  Stem will endeavor not to restate those arguments herein, except as necessary to underscore certain key contentions, and to respond to new arguments that Scottsdale makes in its opposition.

## II.

## BURDEN OF PROOF

Stem's motion focuses solely on Scottsdale's defense obligations.  As such, its burden is a light one.  Stem is entitled to summary judgment if it can prove the existence of a *"potential for coverage." Montrose Chem. Corp. v. Superior Court*, 6 Cal.4th 287, 300 (1993) (italics in original).  Scottsdale, in contrast, must prove *"the absence of any such potential." Id.* (italics in original).

**III.**

**STEM'S DIRECTORS FACE *POTENTIAL* LIABILITY**
**FOR *TWO* CLAIMS TRIGGERING *TWO* POLICIES**

Stem submits that under subsection a. of the definition of "**Claim**," the 2017 Shareholder Lawsuit asserts *two* separate and unrelated **"Claims"** against Stem's directors.  One being a "written demand . . . for monetary damages" in connection with the 2013 Series B Financing Claim, and the other being a "written demand . . . for monetary damages" in connection with the 2017 Buzby Loan Claim.

Stem further submits these two **"Claims"** potentially trigger *two* of Scottsdale's policies.  The Series B Financing Claim arises out of the facts or circumstances that Stem's insurance broker noticed to Scottsdale on October 17, 2013, and is *"deemed"* to have been made <u>during the term of the 2013-2014 Policy</u>.  The Buzby Loan Claim, on the other hand, was "first made" against Stem's directors when the 2017 Shareholder Lawsuit was filed on May 12, 2017, *i.e.*, <u>during the term of the 2016-2017 Policy</u>.

Scottsdale counters with two arguments: it disputes the notion that a single lawsuit can encapsulate two **"Claims,"** and it further contends the Series B Financing Claim and the Buzby Loan Claim should be deemed a single **"Claim"** made in 2010 pursuant to its policies' **"Interrelated Wrongful Acts"** provision.  Stem addresses both of these arguments below.

**A.    The "Claim" Definition**

Scottsdale posits: "The Underlying Action is a civil proceeding and to accept Stem's interpretation that it is both a written demand and a civil proceeding would render the term 'civil proceeding' meaningless as every civil proceeding would be a demand letter."  Scottsdale's Opposition, p. 12:17-20.

However, courts recognize that the application of one "Claim" definition should not foreclose application of another.  In other words, while a civil proceeding is a "Claim" in and of itself, where a civil proceeding contains discreet demands for monetary damages or non-monetary or injunctive relief, there may be multiple "Claims" within the

1   same proceeding.  *See, e.g., Tapestry v. Liberty Ins. Underwriters*, No.

2   CV-18-04857-PHX-JJT, 2020 U.S. Dist. LEXIS 142858, *13 (D. Ariz. Feb. 13, 2020)

3   ("while it is true that an entire judicial proceeding can constitute a Claim, it can also be

4   true that written demands for monetary relief within a lawsuit can also be Claims.").

5        The California Supreme Court in *Bay Cities Paving & Grading, Inc. v. Lawyers'*

6   *Mutual Ins. Co.*, 5 Cal.4th 854 (1993) has endorsed this interpretation.  The policy in *Bay*

7   *Cities* defined "Claim" to mean "a demand, including service of suit or institution of

8   arbitration proceedings, for money against the insured."  *Id.* at 859.  The Supreme Court

9   stated that it "agree[d] with the Court of Appeal's view that including multiple claims

10  within a single action does not render them a single claim."  *Id.*

11       Scottsdale's contention that the 2017 Shareholder Lawsuit cannot contain more

12  than one **"Claim"** is simply not correct.

13  **B.    The "Interrelated Wrongful Acts" Argument**

14       Scottsdale contends the Series B Financing Claim and the Buzby Loan Claim arise

15  out of the same **"Interrelated Wrongful Acts"** that were alleged in connection with the

16  2010 Employment Dispute, and so should be deemed a single **"Claim"** made before its

17  first policy incepted on October 13, 2011.  Scottsdale Opposition, pp. 11:26-28 and 15:9-

18  11.  Scottsdale is once again incorrect.

19       In all material respects, the **"Wrongful Acts"** underpinning the Series B Financing

20  Claim and the Buzby Loan Claim are distinct – *logically, temporally, and causally* – from

21  the 2010 Employment Dispute.  They involve different injuries, occurring at different

22  times to different persons (except Mr. Reineccius), and attributable to entirely different

23  efficient causes.  The Series B Financing Claim and the Buzby Loan Claim involve

24  alleged breaches of fiduciary duty in connection with two separate, and unrelated,

25  financial transactions at Stem in 2013 and 2017.  By contrast, the 2010 Employment

26  Dispute involves Mr. Reineccius's termination from Stem, for "cause," in 2010.  *See Bay*

27  *Cities, supra,* 5 Cal.4th at 873 (claims are not related when their

28  / / /

1   relationship is "so attenuated or unusual that an objectively reasonable insured could not

2   have expected they would be treated as a single claim under the policy.").

3          Scottsdale tries to connect these disparate matters by arguing that the underlying

4   plaintiffs "allege that the ongoing scheme to deprive Reineccius and the other Plaintiffs

5   of their shares in the company started in 2010 with Reineccius['s] wrongful

6   termination[.]"  Scottsdale Opposition, pp. 16:27-17:1.  However, this contention makes

7   no sense.  Three of the underlying plaintiffs, Mr. Grimm, Mr. Klingsporn, and Ms.

8   Berlin, did not own any shares in Stem in 2010.  Declaration of Brian Thompson, ¶¶2-3.

9   The underlying plaintiffs use the word "scheme" only twice in the original complaint, at

10  paragraphs 41 and 42.  In those paragraphs, the underlying plaintiffs allege that this

11  scheme first emerged during a board meeting on October 5, 2012, *i.e.*, approximately a

12  year and a half after the 2010 Employment Dispute was settled, and one year after

13  Scottsdale issued its first policy to Stem on October 13, 2011.

14         Regardless, whether any scheme existed is a disputed fact in the 2017 Shareholder

15  Litigation.  Stem's directors deny such a scheme existed.  Stem Exhs. "GG" at 509; "HH"

16  at 518; and "II" at 525; Stem's Request for Judicial Notice; Declaration of Gary Osborne

17  ("Osborne Decl."), ¶¶4-6.  Under California law, Scottsdale does not meet its burden of

18  proof by pointing to <u>disputed allegations</u> in the very complaint it is being asked to

19  defend.  *See Amato v. Mercury Cas. Co.*, 18 Cal.App.4th 1784, 1790 (1993) ("[T]he

20  existence of a disputed fact determinative of coverage *establishes* the duty to defend." )

21  (italics in original).

22                                        **IV.**

23                     **THE "PRIOR & PENDING" ARGUMENT**

24         Scottsdale argues the Prior & Pending Exclusion bars coverage because the 2017

25  Shareholder Lawsuit "is based upon and arises out of and directly and indirectly

26  involves" certain letters, an EDD claim for unemployment insurance, and an arbitration,

27  all of which predated its policies' Continuity Date of October 13, 2011.  Scottsdale

28  Opposition, p. 17:18-25.

1    Stem addresses the Prior & Pending Exclusion at length in its opposition to

2    Scottsdale's cross-motion.  (Stem Opposition, pp. 7:4-10:11.)  As discussed therein, the

3    Series B Financing Claim and the Buzby Loan Claim in the 2017 Shareholder Lawsuit *do*

4    *not* share operative facts with the letters, the EDD claim, or the arbitration related to Mr.

5    Reineccius's 2010 Employment Dispute.  As this Court has already ruled,

6    (1) Mr. Reineccius's employment claims "were fully and finally resolved" in the 2011

7    Settlement Agreement; (2) discussion of the 2010 Employment Dispute in the 2017

8    Shareholder Lawsuit is "background;" and (3) "[t]he claims in the Underlying Lawsuit

9    are based solely on alleged wrongful acts that occurred after Reineccius's termination in

10   2010."  Stem Exh. "G" at 146.  (Underscore added.)

11   Scottsdale seeks to side-step the Court's prior ruling via the introduction of "new"

12   evidence.  Scottsdale contends this new evidence demonstrates that "the parties litigated

13   the 2010 Dispute despite the 2011 Settlement Agreement."  Scottsdale Opposition, p.

14   17:12-17.  As discussed below, however, Scottsdale's "new" evidence does not support

15   this contention.

16   The first new document Scottsdale references is the "the order compelling

17   arbitration[.]"  Scottsdale Opposition, p. 17:14; Scottsdale Exh. "CC."  However, a

18   review of this order reveals only that the underlying court ruled that a portion of

19   Mr. Reineccius's claims had to be arbitrated pursuant to the terms of his 2009 and 2010

20   Restricted Stock Purchase Agreement, pending the outcome of which the remainder of

21   the litigation would be stayed.  Scottsdale Exh. "CC," p. 6.  This procedural ruling

22   provides no support for Scottsdale's contention that the 2010 Employment Dispute was

23   "re-litigated" in the 2017 Shareholder Lawsuit.[1]

24   / / /

25   / / /

26   

27   [1]    As has been previously noted, in their "Opposition to Petition to Compel
     Arbitration," the underlying plaintiffs made clear that any claims related to the 2010

28   Employment Dispute "were resolved by the Settlement Agreement and are not before this
     Court."  Stem Exh. "X" at 390.

1    The second new document is Mr. Rice's "Motion for Summary Judgment and to

2 Strike Portions of Complaint."  However, Mr. Rice's motion sought to strike any

3 allegations pertaining to the 2010 Employment Dispute on the grounds that they are

4 "impertinent," "immaterial," and "have nothing to do with" the claims asserted in the

5 2017 Shareholder Lawsuit.  Stem Exh. "Y" at 434-436.  Again, this motion provides no

6 support for Scottsdale's contention that the 2010 Employment Dispute was being re-

7 litigated.

8    The third and fourth documents Scottsdale presents (under seal) are the August

9 2019 Settlement Agreements with Mr. Reineccius and Ms. Berlin.  Both include broad

10 releases.  Scottsdale Exhs "EE", p. 2; and "FF," p. 2.  Implicitly, Scottsdale appears to be

11 contending that this broad release language is proof the 2010 Employment Dispute was

12 being litigated in the 2017 Shareholder Lawsuit.  If that is indeed Scottsdale's contention,

13 it is a mistaken one.  It is axiomatic that settling parties often include release language

14 that extends beyond the claims actually being litigated.  Stem wished permanently to part

15 company with Mr. Reineccius, and sought to ensure via broad release language, attached

16 to an attorney fee provision, that he would never try and resurrect past grievances,

17 including his 2010 Employment Dispute.

18    In sum, Scottsdale cannot meet its burden of proving with conclusive evidence an

19 overlap of operative facts between the two **"Claims"** in the 2017 Shareholder Lawsuit,

20 on the one hand, and the 2010 Employment Dispute, on the other hand.  Accordingly, the

21 Prior & Pending Exclusion does not excuse its defense obligation.

22                                          **V.**

23                      **THE "PRIOR KNOWLEDGE" ARGUMENT**

24    Stem has addressed the Prior Knowledge Exclusion in its opposition to

25 Scottsdale's cross-motion.  Stem Opposition, p. 10:12-22.

26 / / /

27 / / /

28 / / /

# VI.

## THE "WARRANTY CONDITIONS" ARGUMENT

Stem has addressed Scottsdale's Warranty Conditions Argument both in its motion, and in its opposition to Scottsdale's cross-motion.  Stem Motion, pp. 16:5-20:16; and Stem Opposition, pp. 10:23-14:21.  Stem contends it responded accurately to Question IV-1 on its original application for insurance ("2011 Application"), and that even if Stem's response was incorrect, Scottsdale's remedy does not extend to barring coverage for the **"Claims"** in the 2017 Shareholder Lawsuit.

Stem will focus in this reply on the second of these contentions, concerning Scottsdale's remedy for a non-disclosure, which is in itself dispositive.  Stem submits Scottsdale cannot meet its burden of proving that the exclusionary language in its "Amend Warranty" endorsement bars coverage.  This exclusionary language, applicable in the event of an intentional or material misrepresentation or omission, reads as follows:

> In the event the **Application**, including materials submitted or required to be submitted therewith, contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by the **Insurer** under this **Policy**, this **Policy** . . . shall not afford coverage . . . for any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any untruthful or inaccurate statements, representations or information[.]

Stem Exhs. "A" at 28; and "B" at 80.  (Underscore added.)

As already argued by Stem, and not disputed by Scottsdale, *two* things must be proven by Scottsdale for the above-quoted exclusionary language to bar coverage under either the 2013-2014 Policy or the 2016-2017 Policy.  First, Scottsdale must prove that the **"Application"** for these policies included a misrepresentation or omission.  And second, Scottsdale must prove that both of the **"Claims"** in the 2017 Shareholder Lawsuit arise out of, or in any way involve, an alleged non-disclosure concerning the 2010 Employment Dispute.

/ / /

Scottsdale cannot clear the first hurdle.  The definition of **"Application"** in both policies *does not* encompass, or extend back to, the 2011 Application.  In this regard, the term **"Application"** is defined in both policies as follows:

> **Application** means all applications, including any attachments thereto, and all other information and materials submitted by or on behalf of the **Insureds** to the **Insurer** in connection with the **Insurer** underwriting this **Policy** <u>or any policy of which this</u> <u>**Policy** is a renewal or replacement.</u>  All such applications, attachments, information, materials and documents are deemed attached to and incorporated into this **Policy**.

Stem Exhs. "A" at 7; and "B" at 58.  (Underscore added.)

According to this definition, the term **"Application"** in the 2013-2014 Policy only encompasses material submitted in applying for the 2013-2014 Policy, or in applying for any policy of which it was a "renewal or replacement," *i.e.*, <u>the policy in effect from</u> <u>2012-2013</u>.  Likewise, the term **"Application"** in the 2016-2017 Policy only encompasses material submitted in applying for the 2016-2017 Policy, or in applying for any policy of which it was a "renewal or replacement," *i.e.*, <u>the policy in effect from</u> <u>2015-2016</u>.  In neither case does the definition of "**Application**" encompass, or extend back to, the 2011 Application.

Scottsdale, in its opposition, posits a different interpretation.  Scottsdale notes that the definition of **"Application"** refers to *"all"* applications submitted to Scottsdale for *"any"* policy of which "this Policy" is a renewal.  Scottsdale asks the Court to interpret this language to mean the term **"Application"** encompasses all applications for any policy it ever issued to Stem going back in time, including the 2011 Application.  For several reasons, this is not a reasonable interpretation.

First, using the 2013-2014 Policy as the example, the plural phrase "*all* applications" is entirely consistent with interpreting **"Application"** to encompass only the application for the 2013-2014 Policy, and the application for the policy of which it was a renewal, *i.e.*, the 2012-2013 Policy.  This totals two applications, and possibly more if supplemental applications were required and submitted.

/ / /

Second, the term *"any"* before the singular noun "policy" has a singular connotation, particularly in the context of the phrase "any policy of which this **Policy** is a renewal or replacement."  By definition "any policy" that was renewed or replaced by "this **Policy**" was a *single* policy.  *See* www.irmi.com/glossary (defining "renewal policy" as "an insurance policy issued to replace **an** expiring policy.") (Emphasis added.)  Similarly, "replacement" means "a person or thing that replaces **another**."  *See* https://www.dictionary.com/browse/replacement (emphasis added).

Third, Stem's interpretation is consistent with the respective declaration pages of the 2013-2014 Policy and the 2016-2017 Policy.  Both clearly identified the *singular*, expiring policy of which each was a renewal.  Stem Exhs. "A" at 1; and "B" at 52.

Fourth, additional support for Stem's interpretation is found in an alternative definition of **"Application"** that Scottsdale Indemnity Company utilizes in another policy form.  This alternate definition clearly informs an insured that all applications going back in time are included:

> Application means each and every signed application, any attachments to such applications, other materials submitted herewith or incorporated therein and any other documents submitted in connection with the underwriting of this Policy or the underwriting of any other [professional liability insurance policy] . . . of which this Policy is a renewal, replacement **or successor in time.**

Stem Exh. "FF" at 492 (underscore and bolding added); Osborne Decl., ¶3.

Unlike the more restrictive definition in Stem's policies, this broader definition of **"Application"** encompasses each and every application for any policy of which "this Policy" is a renewal, replacement "or successor in time."  This language is materially different, and plainly communicates to an insured that the applications for all policies going back in time are included within the definition.  Under California law, an insurer's failure to use "available language" to limit coverage "implies a manifested intent not to do so."  *See Pardee Construction Co. v. Insurance Co. of the West*, 77 Cal.App.4th 1340, 1359 (2000).

/ / /

1    And fifth, Scottsdale has designated an expert in this case named Larry Goanos,

2    who is the author of a book entitled "D&O 101." In his book, Mr. Goanos addresses the

3    importance of the definition of "Application" in the following passage:

> The definition of the Application is critical because it establishes
> which materials and information the carrier is relying upon in
> underwriting the D&O policy. . . . What's essential from the
> applicant's and broker's perspective is that they understand
> exactly what information the carrier is relying upon in
> underwriting the policy and that all such information is accurate.
> These days, in a relatively "soft" insurance market (which works
> in the insureds' favor), applicants are generally successful in
> getting the definition of the Application restricted to only
> information released in the previous year. In certain
> circumstances, however, carriers may declare that the previous
> three- or five-years' worth of information shall be considered part
> of the Application.

11   Stem Exh. "EE" at 486-487 (underscore added); Osborne Decl., ¶2.

12   This is precisely how Stem contends Scottsdale has restricted its definition of

13   **"Application"** in the relevant policies, *i.e.*, restricting it to encompass only those

14   "applications . . . submitted by or on behalf of the **Insureds** . . . in connection with the

15   **Insurer** underwriting this **Policy** [*e.g.*, the 2013-2014 Policy] or any policy of which this

16   **Policy** is a renewal or replacement [*e.g.*, the 2012-2013 Policy]." Accordingly, under

17   neither the 2013-2014 Policy, nor the 2016-2017 Policy, does the definition of

18   **"Application"** encompass, or extend back to, the 2011 Application.

19   Stem submits its interpretation of the defined term **"Application"** is reasonable on

20   its face, while Scottsdale's is unreasonable. However, if the Court were to find that

21   Scottsdale's interpretation is also reasonable, the tie-breaker rule of resolving

22   uncertainties in favor of coverage favors Stem's interpretation. *See AIU Ins. Co. v. Sup.*

23   *Ct. (FMC Corp.)*, 51 Cal.3d 807, 822 (1990) ("In the insurance context, we generally

24   resolve ambiguities in favor of coverage.") (Underscore added.)

25   Even assuming Scottsdale could somehow clear the **"Application"** hurdle, it still

26   cannot prove the exclusionary language in the Amend Warranty endorsement would bar

27   coverage. When applicable, the exclusionary language will only bar coverage "for any

28   **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting

from, in consequence of, or in any way involving, any untruthful or inaccurate statements, representations or information[.]"  The alleged non-disclosure, according to Scottsdale, concerned the 2010 Employment Dispute.  As discussed at length in Stem's opposition to Scottsdale's cross-motion, in relation to the Prior & Pending Exclusion, there is no overlap of operative facts between the **"Claims"** in the 2017 Shareholder Lawsuit, on the one hand, and the 2010 Employment Dispute, on the other hand.  Stem Opposition, pp. 7:4-10:11.  Accordingly, even if it were applicable, the exclusionary language in the Amend Warranty Endorsement <u>does not apply to bar coverage</u>.

## VII.

## <u>THE "BUZBY LOAN" ARGUMENT</u>

Stem has addressed Scottsdale's Buzby Loan Argument in its opposition to Scottsdale's cross-motion.  Stem Opposition, pp. 15:23-16:26.

## VIII.

## <u>THE INSURED VS. INSURED ARGUMENT</u>

This coverage defense has already been litigated by the parties, and ruled upon by the Court, in connection with Scottsdale's Motion to Dismiss.  Stem Exh. "G" at 144-146.  Scottsdale presents no new evidence warranting a departure from the Court's prior ruling.

## IX.

## <u>CONCLUSION</u>

For all of the reasons set forth above, and in Stem's motion and in its opposition to Scottsdale's cross-motion, Scottsdale has breached its defense obligations owed to the three Stem directors named as defendants in the 2017 Shareholder Lawsuit.  Moreover, Scottsdale has breached its defense obligations under both the 2013-2014 Policy *and* the

/ / /

/ / /

/ / /

/ / /

1   2016-2017 Policy.  For these reasons, Stem respectfully requests that this Court grant its
2   motion for partial summary judgment.
3
4   DATED: April 15, 2021                    OSBORNE & NESBITT LLP
5
6                                            By: /s/Gary W. Osborne
                                                 Gary W. Osborne
7                                                Attorney for Plaintiff, STEM, INC.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28