United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEM, INC., | Case No. 20-cv-02950-CRB |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART SCOTTSDALE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART STEM, INC.'S MOTION FOR SUMMARY JUDGMENT** |
| SCOTTSDALE INSURANCE COMPANY, | |
| Defendant. | |

Stem, Inc. has sued its liability insurer, Scottsdale Insurance Company, alleging that Scottsdale breached the terms of their insurance contract when Scottsdale failed to cover Stem's losses associated with a 2017 lawsuit against Stem. In that underlying lawsuit, certain Stem shareholders asserted claims arising from two transactions relevant here: a 2013 Series B financing round and a 2017 loan from Stem board member David Buzby to Stem. Before this Court, Stem asserts various causes of action based on Scottsdale's denial of coverage and requests compensatory and punitive damages, along with attorneys' fees. Scottsdale now moves for summary judgment on all of Stem's claims; Stem moves for partial summary judgment on Scottsdale's obligations under the policy but seeks a jury trial on its claim for breach of the implied covenant of good faith and fair dealing and on Stem's requests for punitive damages and attorneys' fees.

The Court determines that no oral argument is necessary. The Court grants in part and denies in part Scottsdale's motion for summary judgment. The Court grants Scottsdale's motion with respect to (1) Scottsdale's coverage obligations in relation to the 2013 Series B Financing Round Claim in the underlying 2017 Shareholder Lawsuit, (2)

Stem's breach of the implied covenant of good faith and fair dealing claim, and (3) Stem's requests for punitive damages and attorneys' fees.  The Court denies Scottsdale's motion with respect to Scottsdale's coverage obligations in relation to the 2017 Buzby Loan Claim in the underlying 2017 lawsuit.  The Court also grants in part and denies in part Stem's motion for summary judgment.  The Court grants Stem's motion with respect to Scottsdale's coverage obligations in relation to the 2017 Buzby Loan Claim in the underlying 2017 Shareholder Lawsuit.  The Court otherwise denies Stem's motion.

## I.      BACKGROUND

### A.      The Parties

Stem is a technology company that helps customers store and manage electrical power.  See Compl. (dkt. 1) ¶ 5.  Scottsdale is a liability insurer that offers companies the ability to purchase "Business and Management Indemnity" policies that insure for defined losses associated with specific legal claims.  See id. ¶¶ 6–18.  Such a policy requires Scottsdale to cover the costs associated with litigating certain claims brought against the insured company.  From October 13, 2011 to October 27, 2019, Stem was covered by consecutive Business and Management Indemnity policies.  See Stem MSJ (dkt. 35) at 5.

### B.      The 2010 Reineccius Employment Dispute

In September 2010, Stem fired its co-founder Stacey Reineccius after members of the Board of Directors expressed concern over newly revealed information about Reineccius, including his purported lack of a college degree.  See Scottsdale MSJ (dkt 34-1) at 1, 3–4; Scottsdale MSJ Ex. D (dkt. 34-9).  Reineccius responded by contesting the Board's decision and promising to "pursue every legal remedy available" if the company continued to spread falsehoods against him. Scottsdale MSJ Ex. G (dkt. 34-12).  Stem notified Reineccius that it was repurchasing all of his unvested shares in Stem.  See Scottsdale MSJ at 4; Scottsdale MSJ Ex. J (dkt. 34-15).

In November 2010 and January 2011, Reineccius's attorney Richard Grimm wrote to Stem requesting access to documents and demanding to inspect Stem's books.  See Scottsdale MSJ at 4; Scottsdale MSJ Ex. L (dkt. 34-17); Scottsdale MSJ Ex. M (dkt. 34-

18).  Reineccius also filed a claim with the Employment Development Department in California, which ultimately found that he was not terminated "for cause."  Scottsdale MSJ at 4-5; Scottsdale MSJ Ex. N (dkt. 34-19).

In February 2011, Stem filed a demand for arbitration against Reineccius.  See Scottsdale MSJ at 5; Scottsdale MSJ Ex. O (dkt. 34-20); Stem MSJ at 4.  In March 2011, Stem and Reineccius agreed to a formal settlement under which Stem issued shares to Reineccius and his lawyers (including Grimm).  See Scottsdale MSJ at 5; Scottsdale MSJ Ex. N; Stem MSJ at 4.  In exchange, Reineccius released all claims against Stem "arising from any omissions, acts, facts or damages that have occurred up until and including" March 28, 2011.  Scottsdale MSJ Ex. N; Stem MSJ at 4.

## C.    The Insurance Policies

### 1.    Insurance Application

Later that year, in September 2011, Stem applied to Scottsdale for a liability insurance policy.  See Stem MSJ at 4; Scottsdale MSJ at 5.  In its application, Stem had to answer a number of questions.  Scottsdale MSJ Ex. B (dkt. 34-7).  Relevant here, Stem was asked

> Within the last three years, has any person or entity proposed for this insurance been the subject of or involved in any litigation, administrative proceeding, demand letter or formal or informal investigation of inquiry including any investigation by the Department of Labor or Equal Employment Opportunity Commission[?]

Id.  Despite the 2010 Reineccius Employment Dispute, Stem answered no.  Id.

### 2.    Policy Language

In October 2011, Scottsdale issued Stem a "Business and Management Indemnity" policy that Stem renewed for eight consecutive one-year terms from October 2011 through October 2019. See Stem MSJ at 5; Stem MSJ Ex. N (dkt. 37-14).[1]

---

[1] Because the policies require Scottsdale to provide coverage for certain legal claims against Stem made during the one-year policy period, see Compl. ¶ 17; Scottsdale Opp'n to MSJ (dkt. 40) at 3, both the 2013-2014 and 2016-2017 policies are at issue here, but for all relevant purposes the policies contain the same language.  See generally Stem MSJ Ex. A (dkt. 37-1) (2013-2014 policy); Stem MSJ Ex. B (dkt. 37-2) (2016-2017 policy).  Because the policies use the same

United States District Court
Northern District of California

### a.    General Coverage

The policy contains an insuring clause that sets out the basic coverage provided. The clause provides that

> [t]he **Insurer** shall pay the **Loss** of the **Company** for which the **Company** has indemnified the **Directors and Officers** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against the **Directors and Officers** during the **Policy Period** . . . and reported to the Insurer pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

Stem MSJ Ex. A. at 12; Stem MSJ Ex. B at 63 (emphasis in original).

The policy then defines the bolded terms. Relevant here, "Loss" means "damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and Costs, Charges and Expenses incurred by Directors and Officers" under the insuring clause. But "Loss" excludes "matters uninsurable under the laws pursuant to which this Policy is construed" and "any amounts owed or paid to one or more securities holders of the Company under any written or express contract or agreement." "Directors and Officers" means "any person who was, now is, or shall become . . . a duly elected or appointed director, officer, or similar executive of the Company [Stem], or any member of the management board of the Company." A "Claim" includes "a written demand against any Insured for monetary damages or non-monetary or injunctive relief; [or] a civil proceeding against any Insured seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading; [or] a civil, administrative or regulatory proceeding, or a formal governmental investigation against any Insured commenced by the filing of a notice of charges, investigative order or similar document." Finally, "Wrongful Act" means "any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by . . . any of the Directors or Officers" while acting as a Director or Officer. Stem MSJ Ex. A at 7–8, 12–14; Stem MSJ Ex. B at 58–59; 63–65.

---

language, the Court refers to them as one "policy."

United States District Court
Northern District of California

1    Thus, under the policy, Scottsdale would pay the legal costs and cover and

2  judgments or settlements that Stem incurred defending Stem's indemnified Directors and

3  Officers against written demands and lawsuits first initiated during the policy period.

### b.    Exclusions

5    The policy outlines several relevant exclusions from the above-described general

6  coverage provision.

### i.    Interrelated Wrongful Acts Exclusion

8    First, the policy provides that "[a]ll Claims arising out of the same Wrongful Act

9  and all Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall

10  be deemed to have been made at . . . the time at which the earliest Claim involving the

11  same Wrongful Act or Interrelated Wrongful Act is first made."  Stem MSJ Ex. A at 18;

12  Stem MSJ Ex. B at 68–69.  Because the policy does not cover Claims made before its

13  inception in October 2011, see Stem MSJ Ex. A. at 12; Stem MSJ Ex. B at 63, the policy

14  does not cover Claims arising from any Interrelated Wrongful Act that occurred before

15  October 2011.  Interrelated Wrongful Acts are "all Wrongful Acts that have as a common

16  nexus any fact, circumstance, situation, event, transaction, cause or series of facts,

17  circumstances, situations, events, transactions or causes."  Stem MSJ Ex. A at 13; Stem

18  MSJ Ex. B at 64.

### ii.    Prior or Pending Litigation Exclusion

20    Second, the policy states that Scottsdale will not be liable for any Loss on account

21  of a Claim

22    alleging, based upon, arising out of, attributable to, directly or
indirectly resulting from, in consequence of, or in any way
23    involving . . . any prior or pending litigation or administrative
or regulatory proceeding, demand letter or formal or informal
24    governmental investigation or inquiry filed or pending on or
before the **Continuity Date**; or any fact, circumstance,
25    situation, transaction or event underlying or alleged in such
litigation or administrative or regulatory proceeding, demand
26    letter or formal or informal governmental investigation or
inquiry.

27  Stem MSJ Ex. A at 16; Stem MSJ Ex. B at 67 (emphasis in original).  Continuity Date

28

refers to October 13, 2011, when the first policy went into effect.  Stem MSJ Ex. A at 1, 12; Stem MSJ Ex. B at 52, 63.

### iii.     Prior Knowledge Exclusion

Third, the policy excludes from coverage any Claim

> alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any **Wrongful Act**, fact, circumstance or situation which any of the **Insureds** had knowledge of prior to the **Continuity Date** where such **Insureds** had reason to believe at the time that such known **Wrongful Act** could reasonably be expected to give rise to such **Claim**.

Stem MSJ Ex. A at 16; Stem MSJ Ex. B at 67 (emphasis in original).

### iv.     Breach of Application Exclusion

Fourth, the policy provides that

> [i]n the event the **Application** [for insurance], including materials submitted or required to be submitted therewith, contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by the **Insurer** under this **Policy**, this **Policy**, including each and all **Coverage Sections**, shall not afford coverage to the following **Insureds** for any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any untruthful or inaccurate statements, representations or information.

Stem MSJ Ex. A at 28; Stem MSJ Ex. B at 80.  This exclusion applies to any Insured who knew of the misrepresentations or omissions.  Id.

### v.     Insured vs. Insured Exclusion

Finally, the policy contains an exclusion for any claims

> brought or maintained by, on behalf of, in the right of, or at the direction of any **Insured** in any capacity, . . . unless [under exception iv to this exclusion] such **Claim** . . . is brought or maintained by any former director or officer of the **Company** solely in their capacity as a securities holder of the **Company** and where such **Claim** is solely based upon and arising out of **Wrongful Acts** committed subsequent to the date such director or officer ceased to be a director or officer of the **Company** and where such **Claim** is first made two (2) years subsequent to the date such director or officer ceased to be a director or officer of the **Company**

Stem MSJ Ex. A at 15; Stem MSJ Ex. B at 66 (emphasis in original).  "Insured" includes Stem as well as its previous, current, and future directors and officers.  Stem MSJ Ex. A at 13; Stem MSJ Ex. B at 64.

### D.    2013 Series B Equity Financing

In November 2013, Stem initiated a Series B equity financing round.  Stem MSJ at 5–6.  The equity financing included a 100:1 "pull forward" provision.  Id. at 6; Buzby Decl. (dkt. 35-4) ¶ 2.  Under this provision, any current investor who participated in the Series B Financing at a company-determined threshold level would receive 100 shares of Stem stock in exchange for each existing share.  Stem MSJ at 6; Buzby Decl. ¶ 3.  Current shareholders who did not participate at the threshold level would not receive 100 shares in exchange for each current share and would thus be diluted.  Stem MSJ at 6; Buzby Decl. ¶ 3.  Stem offered all shareholders an opportunity to participate.  Stem MSJ at 6; Carrington Decl. (dkt. 35-6) ¶ 3.

In December 2013, Grimm (Reineccius's lawyer in the 2010 Employment Dispute and a Stem stockholder after the dispute settled) sent a letter to Stem demanding information about the Series B financing round for the purpose of pleading particularized facts should litigation involving the financing round arise.  Scottsdale MSJ at 6; Scottsdale MSJ Ex. T (dkt. 34-25); Stem MSJ at 6.  In February 2014, Grimm sued Stem in the Delaware Court of Chancery, seeking an order requiring Stem to give him access to the documents he requested.  Stem MSJ at 6; see generally Stem MSJ Ex. P (dkt. 37-16).  On October 13, 2014, the Master in Chancery issued a final report ordering Stem to produce some of the documents requested, but not others.  Stem MSJ at 6; Stem MSJ Ex. Q (dkt. 37-17) at 310.

On October 17, 2014, Stem's insurance broker notified Scottsdale about these events.  Stem MSJ at 7; Stem MSJ Ex. R (dkt. 37-18).[2]  Scottsdale acknowledged

---

[2] Stem notified Scottsdale pursuant to an "Awareness Provision" in the policy, which permitted Stem to "lock in" coverage under a particular liability policy by giving Scottsdale notice of specific facts and circumstances that could give rise to a future claim.  Stem MSJ at 7 n.4.

receiving the information and noted that while the matter was not a "Claim" because it did not involve an allegation of any "wrongful act," it might mature into a Claim in the future. Stem MSJ at 7; Stem MSJ Ex. S (dkt. 37-19).

### E.    2017 Buzby Loan

In 2017, a member of Stem's Board of Directors, David Buzby, loaned Stem $1.5 million.  Stem MSJ at 7; Scottsdale MSJ at 20–21.  The loan came from Buzby's personal funds.  Stem MSJ Ex. W (dkt 37-23) at 385–86.  Stem had recently won a contract with a power company, Southern California Edison, but the contract was contingent on Stem showing that it had sufficient financial resources.  See Stem MSJ at 7.  After Stem's bank was unwilling to provide a letter of credit, Stem needed $1.5 million more to secure the contract, which Buzby provided.  See Stem MSJ Ex. W at 385.

### F.    2017 Shareholder Suit against Stem

In May 2017, four of Stem's shareholders, including Grimm, Reineccius, and two others who received shares due to the 2010 Employment Dispute settlement, filed a lawsuit against three Stem board members; Stem indemnified the defendant board members.  See Stem MSJ at 8; Scottsdale MSJ at 6.  The original complaint asserted claims for breach of fiduciary duty, unjust enrichment, and conspiracy based on the 2013 Series B Financing and the 2017 Buzby Loan.  Stem MSJ Ex. C (dkt. 37-3) at 98, 105–08, 111–12.

The original complaint characterized Stem's allegedly unlawful actions as continuations of the 2010 Employment Dispute with Reineccius.  The complaint first generally alleged that "[s]ince 2010, the Defendants have employed various unlawful means to deprive Plaintiff Reineccius and his colleagues of the benefits of the company he created.  The wrongful acts and omissions described in this Complaint are part of Defendants' continuing campaign against the Plaintiffs."  Scottsdale MSJ at 22; Stem MSJ Ex. C at 98.  It then alleged that the acts and omissions on which the 2017 Shareholder Lawsuit "is based are simply a continuation of the Defendants' perfidious behavior" which first began in the 2010 Employment Dispute.  Stem MSJ Ex. C at 105.

The complaint then alleged that animus towards Reineccius and a desire to dilute

his and his lawyers' ownership in Stem motivated the 2013 Series B Financing.  The complaint alleged that notes from a 2012 Board meeting indicated that the Board viewed ex-employee and non-employee stock ownership as a major issue.  Id.  As a result, "[t]he Board schemed to take those shares [shares held by Reineccius and his lawyers] without payment."  Id.  The complaint alleged that Stem used the pull forward structure in the Series B Financing to dilute the shares given to Reineccius and his lawyers under the earlier settlement.  Id. at 105–08.  The complaint alleged that any other justification for the pull forward structure, including that it was necessary to obtain financing, was pretextual.  Id. at 108–09.

The original complaint did not allege the same particularized connection between the Reineccius employment dispute and the 2017 Buzby Loan.  Instead, the complaint merely stated that "[i]n 2017, Defendant Buzby extended a short-term loan to Stem in the amount of $1,500,000. One month later the 'loan' was paid in full and Buzby received cash and stock worth over $2 million. The Buzby transaction constitutes self-dealing and is a separate breach of his fiduciary duty to Plaintiffs."  Id. at 111–12.

In 2019, Stem settled the 2017 Shareholder Lawsuit with some of the parties, including Reineccius.  Scottsdale MSJ at 7.  Other plaintiffs in the 2017 Shareholder Lawsuit, including Grimm, have not settled and have filed a third amended complaint with the same relevant allegations.  Id. at 8; Scottsdale MSJ Ex. HH (dkt. 38-1).

### G.    The Instant Lawsuit

In June 2017, Stem notified Scottsdale of the 2017 Shareholder Lawsuit and requested coverage for three of Stem's directors.  Scottsdale MSJ at 7; Stem MSJ at 8.  In July 2017, after reviewing the underlying 2017 Shareholder Lawsuit and the 2010 employment dispute, Scottsdale denied coverage.  Scottsdale MSJ at 7; Stem MSJ at 8.  Scottsdale provided several reasons, including that the 2017 Shareholder Lawsuit involved a Claim made before the policy went into effect and that coverage was barred by the Prior Litigation and Prior Knowledge exclusions.  Scottsdale MSJ at 7; Scottsdale MSJ Ex. AA (dkt. 34-32).

On April 29, 2020, Stem sued Scottsdale in this Court alleging breach of contract and tortious breach of the covenant of good faith, seeking declaratory relief and compensatory and punitive damages.  See generally Compl.  Scottsdale moved to dismiss on grounds that this Claim was excluded from the policy under the "Insured vs. Insured" exclusion, see generally MTD (dkt. 14), but this Court denied the motion on July 20, 2020, see Order Denying MTD (dkt. 23).  On March 25, 2021, Scottsdale filed a motion for summary judgment containing new arguments in support of Scottsdale's position that the policy does not cover the underlying 2017 Shareholder Lawsuit.  See generally Scottsdale MSJ.  On the same day, Stem filed a cross-motion for summary judgment on Scottsdale's defense obligations under the policy.  See generally Stem MSJ.  Stem is seeking a jury trial on its breach of the covenant of good faith and fair dealing claim and Stem's requests for punitive damages and attorneys' fees.  See generally Stem Opp'n to MSJ (dkt. 41).

## II.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).  The party moving for summary judgment bears the initial burden of identifying those portions of the evidence that demonstrate the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Ind. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

A liability insurer owes a duty to defend when a suit brought against its insured seeks damages that potentially fall within the coverage of the policy.  Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 19 (1995).  "Where there is no possibility of coverage, there is no duty to defend."  Id. (internal quotation marks omitted).  "To prevail, the insured must

prove the existence of a <u>potential for coverage</u>, while the insurer must establish <u>the absence of any such potential</u>." <u>Montrose Chem. Corp. of Cal. v. Super. Ct.</u>, 6 Cal. 4th 287, 300 (1993) (emphasis in original).  To determine whether an insurer owes a duty to defend, a court must "compar[e] the allegations of the complaint with the terms of the policy."  <u>Id.</u> at 295.  Because California is the forum state in this diversity action, California law governs the Court's interpretation of the Agreement.  <u>See</u> <u>Encompass Ins. Co. v. Coast Nat'l Ins. Co.</u>, 764 F.3d 981, 984 (9th Cir. 2014); <u>Bell Lavalin, Inc. v. Simcoe & Erie Gen. Ins. Co.</u>, 61 F.3d 742, 745 (9th Cir. 1995).[3]  Under California law, "[i]nterpretation of an insurance policy is a question of law and follows the general rules of contract interpretation."  <u>MacKinnon v. Truck Ins. Exch.</u>, 31 Cal. 4th 635, 647 (2003), <u>as modified on denial of reh'g</u> (Sept. 17, 2003).

## III.    DISCUSSION

Stem argues that Scottsdale must cover any loss associated with the underlying 2017 Shareholder Lawsuit.  According to Stem, the Court's prior order denying Scottsdale's motion to dismiss controls.  Stem also argues that the 2017 Shareholder Lawsuit is based on two separate Claims—one arising from the 2013 Series B Financing Round and one arising from the 2017 Buzby loan—and that the general coverage provision applies to both Claims.  And Stem argues that these Claims lack any connection with the 2010 Employment Dispute that could trigger an exception to the general coverage provision.  Finally, Stem argues that its claim for breach of the covenant of good faith and fair dealing and requests for punitive damages and attorneys' fees should go to a jury.

Scottsdale argues that the 2017 Shareholder Lawsuit constitutes one Claim, and that (whether it constitutes one Claim or the 2013 Series B Financing Round Claim and the 2017 Buzby Loan Claim must be considered separately) the 2017 Shareholder Lawsuit is interrelated with the 2010 Employment Dispute, such that the policy's coverage exclusions apply.  Scottsdale also argues that because it had no coverage obligations with respect to

United States District Court
Northern District of California

---

[3]  The parties agree.  <u>See </u>Scottsdale MSJ at 9–10; Stem MSJ at 9–10.

the 2017 Shareholder Lawsuit, it cannot be liable for breach of the covenant of good faith and fair dealing, punitive damages, or attorneys' fees—but that even if it must cover losses associated with the 2017 Shareholder Lawsuit, Scottsdale acted reasonably and in good faith such that it is not liable for breach of the covenant of good faith and fail dealing, punitive damages, or attorneys' fees.

The Court holds that Scottsdale must cover losses associated with the 2017 Buzby Loan Claim but not losses associated with the 2013 Series B Financing Round Claim.  The Court further holds that Stem has failed to demonstrate a genuine issue of material fact with respect to Stem's breach of the covenant of good faith and fair dealing claim and Stem's requests for punitive damages and attorneys' fees.   Therefore, the Court grants in part and denies in part Scottsdale's motion for summary judgment, and the Court grants in part and denies in part Stem's motion for partial summary judgment.

### A.      Effect of Order Denying Motion to Dismiss

The Court must first address Stem's threshold argument that the Court's prior order denying Scottsdale's motion to dismiss controls the disposition of these cross-motions for summary judgment.  See Stem Opp'n to MSJ at 3.

In its order denying Scottsdale's motion to dismiss, the Court stated that the Insured vs. Insured Exclusion did not bar coverage because the "Claims in the Underlying Lawsuit are based solely on alleged wrongful acts that occurred after Reineccius's termination in 2010 and fall under Exception iv to the Insured v. Insured Exclusion."  Order Denying MTD at 7.  The Court noted that claims related to the 2010 Employment Dispute "were fully and finally resolved by the Settlement Agreement and thus cannot have been the basis of the claims he asserted six years later in the Underlying Lawsuit."  Id. at 6.  Stem alleges that Scottsdale is now attempting to relitigate the connection between the 2010 Employment Dispute and the underlying 2017 Shareholder Lawsuit.  See Stem Opp'n to MSJ at 3.

The Court rejects Stem's argument that the Court's prior order controls here.  First, the question whether the Insured vs. Insured Exclusion applies differs from the question

United States District Court
Northern District of California

whether any of the additional exclusions that Scottsdale now invokes apply.  Second, some language in the Court's order denying the motion to dismiss erroneously applied the policy's exclusion language.  See Henslee v. Union Planters Nat. Bank & Trust Co., 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting) ("Wisdom too often never comes, and so one ought not to reject it merely because it comes too late.").  Although the settlement released legal claims related to the 2010 Employment Dispute, that release does not mean that Claims asserted in the 2017 Shareholder Lawsuit could not relate to the 2010 Employment Dispute under the terms of the policy.  The settlement would merely provide a potential defense to such Claims.[4]  In general, to determine whether any Claims in the 2017 Shareholder Lawsuit are sufficiently connected with the 2010 Employment Dispute to trigger a coverage exclusion, the Court must simply compare "the allegations of the [underlying] complaint with the terms of the policy."  Montrose, 6 Cal. 4th at 295.

### B.    Breach of Contract

Stem asserts that Scottsdale has breached its coverage obligations related to the 2017 Shareholder Lawsuit under the insurance contract.  See Stem MSJ at 21.  This issue turns on the insurance policy's specific language.  Recall that the policy contains a general coverage provision,

> [t]he **Insurer** shall pay the **Loss** of the **Company** for which the **Company** has indemnified the **Directors and Officers** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against the **Directors and Officers** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the Insurer pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

Stem MSJ Ex. A at 12; Stem MSJ Ex. B at 63.  And that general policy provision is subject to numerous exclusions.  See supra part I.C.2.b.  The parties disagree regarding whether

---

[4] The Court expresses no view on the merits of the 2017 Shareholder Lawsuit.  The Court merely notes that Reineccius could have (hypothetically) asserted claims in violation of the settlement, and Stem's directors could have (hypothetically) invoked the settlement as a defense.  Thus, the Court was wrong to state or imply that because the settlement released claims arising from the 2010 Employment Dispute, plaintiffs in the underlying action could not have possibly asserted such Claims under the policy's definition of "Claim."

13

the 2017 Shareholder Lawsuit constitutes a single Claim made against certain Directors and Officers, or if the 2017 Shareholder Lawsuit involves two Claims.  They also disagree regarding whether any exclusion to the general policy provision applies.  The Court concludes that the 2017 Shareholder Lawsuit involves two Claims—one arising from the 2013 Series B Financing Round and one arising from the 2017 Buzby Loan.  The Court further concludes that the policy covers only the Claim arising from the 2017 Buzby Loan.

### 1.    Number of "Claims" in the 2017 Shareholder Lawsuit

In California, "[i]nterpretation of an insurance policy is a question of law and follows the general rules of contract interpretation." <u>MacKinnon</u>, 31 Cal. 4th at 647. Under the California Civil Code, an insurance policy, like all contracts, "must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting" as long as the intention is ascertainable.  Cal. Civ. Code § 1636.  <u>See also</u> <u>Waller</u>, 11 Cal. 4th at 18 ("[T]he interpretation of a contract must give effect to the 'mutual intention' of the parties.").  When the policy language is clear, "[s]uch intent is to be inferred . . . solely from the written provisions of the contract." <u>Waller</u>, 11 Cal. 4th at 18. But if the language of the contract is ambiguous, a court is to look to "the insured's objectively reasonable expectations" of the policy to determine whether coverage exists. <u>Bank of the W. v. Superior Ct.</u>, 2 Cal. 4th 1254, 1265 (1992).  If this inquiry still does not resolve the ambiguity, the court is to resolve the ambiguity in the insured's favor.  <u>Id.</u>

As discussed above, the policy defines "Claim" to mean, in relevant part,

> a.    a written demand against any Insured for monetary damages or non-monetary or injunctive relief; . . .
> c.    a civil proceeding against any Insured seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading;  . . .
> e.    an arbitration proceeding against any Insured seeking monetary damages or non-monetary or injunctive relief[.]

Stem MSJ Ex. A at 12; Stem MSJ Ex. B at 63.  Although the policy does not define the phrase "written demand," California court have held that in the insurance "context," "demand means a request for something under an assertion of right." <u>Westrec Marina</u>

1    Mgmt., Inc. v. Arrowood Indem. Co., 163 Cal. App. 4th 1387, 1392 (2008) (internal

2    quotation marks omitted).

3         That begs the question whether two causes of action in a lawsuit constitute separate

4    "Claims."  On the one hand, each cause of action in the complaint is a written "request for

5    something under an assertion of right," and therefore a written demand or separate Claim.

6    On the other hand, the policy seems to define a "civil proceeding" (i.e., a lawsuit) as one

7    Claim.

8         California courts have answered this question by treating more than one cause of

9    action that qualifies as a written demand as more than one Claim.  Indeed, when

10   interpreting a similar policy, the California Supreme Court has "rejected" the "argument

11   there is only one claim because there is only one lawsuit."  Bay Cities Paving & Grading,

12   Inc. v. Lawyers' Mut. Ins. Co., 5 Cal. 4th 854, 859 (1993).  "Including multiple claims

13   within a single action does not render them a single claim."  Id.  In another case involving

14   a policy that defined "Claims to include lawsuits, written notices of claims, or written

15   notices of facts which may reasonably be expected to give rise to claims," the California

16   Court of Appeal held that "Claim does not mean entire action, but is in fact limited to the

17   relevant claims within the action."  Health Net, Inc. v. RLI Ins. Co., 206 Cal. App. 4th 232,

18   246, 261 (2012), as modified on denial of reh'g (June 12, 2012).

19        Applying these rules here, the 2017 Shareholder Lawsuit involves at least two

20   "Claims" under the policy.  The lawsuit first asserts causes of action for breach of

21   fiduciary duty, conspiracy, and unjust enrichment based on allegations that the underlying

22   defendants schemed to dilute the underlying plaintiffs' shares through the 2013 Series B

23   Financing Round.  See Stem MSJ Ex. C at 105–06.  The lawsuit separately asserts a cause

24   of action for breach of fiduciary duty based on allegations that the 2017 Buzby Loan

25   constituted impermissible self-dealing.  See id. at 111–12.  Thus, the causes of action

26   relating to the 2013 Series B Financing and the 2017 Buzby Loan were separate

27   "demand[s] . . . for monetary damages," and thus separate Claims.  See Stem MSJ Ex. A at

28   12; Stem MSJ Ex. B at 63.  That the policy also defines a civil proceeding (i.e., an entire

United States District Court
Northern District of California

15

lawsuit) to constitute a Claim does not change this result.  See Bay Cities Paving &

Grading, 5 Cal. 4th at 859; Health Net, 206 Cal. App. 4th at 246, 261.

### 2.    Scottsdale's Coverage Obligation

Scottsdale argues that five different provisions exclude these Claims from coverage

under the policy.  Thus, the Court must determine whether each provision applies to the

2013 Series B Financing Claim and the 2017 Buzby Loan Claim.  As explained below,

application of each provision depends on the relationship between the Claims and the 2010

Employment Dispute.  The Court concludes that the 2013 Series B Financing Claim is

interconnected with that dispute, but the 2017 Buzby Loan Claim is not.  Therefore,

Scottsdale is obligated to pay Stem's "Loss" for which Stem indemnified the Directors and

Officers, and which the Directors and Officers have become legally obligated to pay by

reason of the 2013 Series B Financing Claim.  Scottsdale is not obligated to pay Stem's

"Loss" arising from the 2017 Buzby Loan Claim.

### a.    Interrelated Wrongful Act Exclusion

Scottsdale first argues that the Claims are excluded from coverage because they

"aris[e] out of" the 2010 Employment Dispute.  Scottsdale MSJ at 13–15.  Scottsdale

points to policy language stating that "[a]ll Claims arising out of the same Wrongful Act

and all Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall

be deemed to have been made at . . . the time at which the earliest Claim involving the

same Wrongful Act or Interrelated Wrongful Act is first made."  Stem MSJ Ex. A at 18;

Stem MSJ Ex. B at 68–69.  The policy covers only Claims made during the period the

policy is active.  See Stem MSJ Ex. A. at 12; Stem MSJ Ex. B at 63.  "Wrongful Act"

means "any actual or alleged error, omission, misleading statement, misstatement, neglect,

breach of duty or act allegedly committed or attempted by . . . any of the Directors or

Officers solely by reason of his or her serving in such capacity."  Stem MSJ Ex. A at 14;

Stem MSJ Ex. B at 65.  And "Interrelated Wrongful Acts" means "all Wrongful Acts that

have as a common nexus any fact, circumstance, situation, event, transaction, cause or

series of facts, circumstances, situations, events, transactions or causes."  Stem MSJ Ex. A

United States District Court
Northern District of California

at 13; Stem MSJ Ex. B at 64.  Thus, under this exclusion, all Claims arising from conduct with a common nexus will constitute a single Claim, and that Claim is deemed to have happened when the relevant conduct first occurred.

Here, the 2013 Series B Financing Claim is interrelated with the 2010 Employment Dispute. The 2010 Employment Dispute involved a "Claim" because it gave rise to arbitration proceedings before it settled.  The 2013 Series B Financing Claim alleges that Stem pursued the 2013 Series B Financing, with its 100:1 pull forward structure, in order to dilute the outside equity holders who received shares under the settlement.  Stem MSJ Ex. C at 105–08.  In other words, at least according to the 2017 Shareholder Lawsuit, the 2013 Financing occurred partly in response to the settlement.

That said, the 2017 Buzby Loan Claim is not interrelated with the 2010 Employment Dispute.  Although the complaint in the 2017 Shareholder Lawsuit includes general allegations that the "wrongful acts and omissions described in this Complaint are part of [Stem's] continuing campaign against" Reineccius and other equity holders, the complaint does not assert or even imply any connection between the 2010 Employment Dispute and 2017 Buzby Loan.  Stem MSJ Ex. C at 99.  While the 2017 Shareholder Lawsuit spends five pages detailing the specific connections between the 2010 Employment Dispute and 2013 Series B Financing, the Lawsuit does not spend even a paragraph doing the same for the 2017 Buzby Loan.  Stem MSJ Ex. C at 105–09.  Instead, it merely states that "[i]n 2017, Defendant Buzby extended a short-term loan to Stem in the amount of $1,500,000. One month later the 'loan' was paid in full and Buzby received cash and stock worth over $2 million. The Buzby transaction constitutes self-dealing and is a separate breach of his fiduciary duty to Plaintiffs."  Id. at 111–12 (emphasis added). Thus, the 2017 Shareholder Lawsuit does not show, and Scottsdale has provided no other evidence demonstrating, that the 2017 Buzby Loan arises out of, or is any way related to, the 2010 Employment Dispute.

Therefore, under the Interrelated Wrongful Act Exclusion, the 2013 Series B Financing Claim and the 2010 Employment Dispute constitute one Claim, and that Claim

is deemed to have occurred in 2010, before the policy commenced.  The same is not true for the 2017 Buzby Loan Claim.  The 2013 Series B Financing Claim is excluded from coverage, but the 2017 Buzby Loan Claim is not.

### b.    Prior and Pending Litigation Exclusion

Scottsdale next argues that the policy provides for an exclusion for Claims related to litigation pre-dating or pending at the time of the initiation of coverage.  In particular, the policy states that Scottsdale will not be liable for any Loss on account of a Claim

> alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving . . . any prior or pending litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry filed or pending on or before the **Continuity Date**; or any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry[.]

("Prior of Pending Litigation Exclusion").  Stem MSJ Ex. A at 16; Stem MSJ Ex. B at 67.  Continuity Date refers to October 13, 2011, the date Stem first took out a policy with Scottsdale.  Stem MSJ Ex. A at 1, 12; Stem MSJ Ex. B at 52, 63.

For reasons similar to those stated above, this provision excludes the 2013 Series B Financing Claim from coverage but does not exclude the 2017 Buzby Loan Claim.[5]  The 2013 Series B Financing Claim is a Claim "in any way involving" the 2010 Employment Dispute proceedings.  But there is still no connection between the 2017 Buzby Loan Claim and the 2010 Employment Dispute.  Scottsdale cites no facts in support of a connection beyond the general allegations at the beginning of the 2017 Shareholder Lawsuit that the "wrongful acts and omissions described in this Complaint are part of [Stem's] continuing campaign against" Reineccius and other equity holders.  Stem MSJ Ex. C at 99.  As Scottsdale can point to no specific connection, no matter how tangential, between the

---

[5] Stem does not dispute that the events surrounding the 2010 employment dispute rise to the level of "prior or pending litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry."  See Stem MSJ at Stem Opp'n to MSJ at 7–10; Stem Reply to MSJ (dkt. 43) at 4–6.

United States District Court
Northern District of California

1   events surrounding the 2010 Employment Dispute and the 2017 Buzby Loan, it cannot

2   show "the absence of . . . [a] potential" for coverage.  Montrose, 6 Cal. 4th at 300

3   (emphasis in original).

4                          **c.      Prior Knowledge Exclusion**

5           Scottsdale also argues that Stem's prior knowledge of these Claims before the

6   inception of the policy bars their coverage under the terms of the policy.  Scottsdale MSJ

7   at 16–17.  Scottsdale points to the language of the policy which excludes coverage of any

8   Claim

9           alleging, based upon, arising out of, attributable to, directly or
    indirectly resulting from, in consequence of, or in any way
10          involving, any **Wrongful Act**, fact, circumstance or situation
    which any of the **Insureds** had knowledge of prior to the
11          **Continuity Date** where such **Insureds** had reason to believe at
    the time that such known **Wrongful Act** could reasonably be
12          expected to give rise to such **Claim**[.]

13  Stem MSJ Ex. A at 16; Stem MSJ Ex. B at 67.  Like the exclusions discussed above, this

14  provision's application depends on whether there is a connection between the Claim and

15  any circumstance or Wrongful Act occurring before the inception of the policy, but

16  includes the added caveat that when Stem entered into the insurance agreement, Stem "had

17  reason to believe" that the known Wrongful Act "could reasonably be expected to give rise

18  to such Claim."  Id.  Because the Interrelated Wrongful Act and Prior and Pending

19  Litigation Exclusions apply to the 2013 Series B Financing Round Claim, the Court need

20  not determine whether this Prior Knowledge Exclusion also applies to that Claim.  And

21  because Scottsdale has not shown that the 2017 Buzby Loan Claim is connected to the

22  2010 Employment Dispute, it also cannot show that this Prior Knowledge Exclusion

23  applies to the 2017 Buzby Loan Claim.

24                          **d.      Breach of Application Exclusion**

25          Scottsdale also argues that Stem's insurance application, which answered "no"

26  when asked whether in the prior three ears Stem had "been the subject of or involved in

27  any litigation, administrative proceeding, demand letter or formal or informal investigation

28  or inquiry including any investigation by the Department of Labor or Equal Employment

United States District Court
Northern District of California

Opportunity Commission," Scottsdale MSJ Ex. B, triggers the Breach of Application

Exclusion.

That exclusion provides:

> [i]n the event the **Application**, including materials submitted
> or required to be submitted therewith, contains any
> misrepresentation or omission made with the intent to deceive,
> or contains any misrepresentation or omission which materially
> affects either the acceptance of the risk or the hazard assumed
> by the **Insurer** under this **Policy**, this **Policy**, including each
> and all **Coverage Sections**, shall not afford coverage to the
> following **Insureds** for any **Claim** alleging, based upon,
> arising out of, attributable to, directly or indirectly resulting
> from, in consequence of, or in any way involving, any
> untruthful or inaccurate statements, representations or
> information[.]

Stem MSJ Ex. A at 28; Stem MSJ Ex. B at 80.  The exclusion applies to any Insured who

knew of the misrepresentations or omissions.  Stem MSJ Ex. A at 28; Stem MSJ Ex. B at

80.

Once again, this exclusion applies to the 2013 Series B Financing Claim but not the

2017 Buzby Loan Claim.  Stem's application contained a misrepresentation because

Reineccius's September 2010 letter to Stem was a demand letter.  <u>See</u> Scottsdale MSJ Ex.

G.  Thus, the Breach of Application Exclusion's remedy for a misrepresentation in the

application applies, and any Claim in any way involving that misrepresentation is excluded

from coverage.  As discussed above, the 2013 Series B Financing Claim has a connection

with the 2010 Employment Dispute, including Reineccius's demand letter.  But the 2017

Buzby Loan Claim does not.[6]

### e.      Insured v. Insured Exclusion

Finally, Scottsdale argues that the exclusion for disputes involving two insured

parties applies.  The Insured v. Insured Exclusion bars coverage for any Claim

---

[6] The Court rejects Stem's argument that Stem's initial insurance application is not an
"Application" under the later policies because the policies use that term to refer only to those
applications in connection with the immediately preceding policy.  <u>See</u> Stem MSJ at 19.  The
"Application" definition includes applications made in connection with "any" policy of which the
relevant policy constitutes a renewal.  Stem MSJ Ex. A at 10.

United States District Court
Northern District of California

> brought or maintained by, on behalf of, in the right of, or at the direction of any **Insured** in any capacity, . . . unless [under exception iv to this exclusion] such **Claim** . . . is brought or maintained by any former director or officer of the **Company** solely in their capacity as a securities holder of the **Company** and where such **Claim** is solely based upon and arising out of **Wrongful Acts** committed subsequent to the date such director or officer ceased to be a director or officer of the **Company** and where such **Claim** is first made two (2) years subsequent to the date such director or officer ceased to be a director or officer of the **Company**[.]

Stem MSJ Ex. A at 15; Stem MSJ Ex. B at 66.  The term "Insured" includes Stem as well as its previous current, and future directors and officers.  See Stem MSJ Ex. A at 13; Stem MSJ Ex. B at 64.  For the reasons discussed above, the 2013 Series B Financing Round Claim arises from Wrongful Acts committed during the 2010 Employment Dispute, so as to trigger application of this exclusion.  But the 2017 Buzby Loan Claim "is solely based upon or arising out of" acts committed more than two years after the end of Reineccius's employment, such that this exclusion does not apply to the 2017 Buzby Loan Claim.

### f.  "Wrongful Act"

Scottsdale advances one last argument against its coverage obligations in relation to the 2017 Buzby Loan Claim.  As discussed above, the general coverage provision covers only "Claim[s] . . . for any Wrongful Act taking place prior to the end of the Policy Period."  Stem MSJ Ex. A. at 12; Stem MSJ Ex. B at 63.  Wrongful Act "means any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by . . . any of the Directors or Officers solely by reason of his or her serving in such capacity."  Stem MSJ Ex. A at 14; Stem MSJ Ex. B at 65.  Scottsdale argues that because the loan to Stem came from Buzby in his personal capacity, Stem MSJ Ex. W at 385–86, the loan is not a Wrongful Act committed by a Director "solely by reason of his or her serving" in a capacity as a Director.  Scottsdale MSJ at 20–21.  Thus, Scottsdale argues, the general coverage provision cannot apply to the 2017 Buzby Loan Claim.

Scottsdale's argument misunderstands the 2017 Buzby Loan Claim.  The 2017 Shareholder Lawsuit alleges that Buzby breached his fiduciary duty as a Director when he

participated in this transaction using his own funds, for his personal financial benefit. Stem MSJ at 111–12.  That the funds came from his personal account only bears on the impropriety of him undertaking this course of action as a Director.  Thus, the underlying cause of action centers on Buzby's conduct as a Director, and the "Wrongful Act" definition embraces the conduct giving rise to the 2017 Buzby Loan Claim.  See Stem MSJ Ex. A at 14; Stem MSJ Ex. B at 65.

*

Having considered each exclusion, the Court concludes that Scottsdale is obligated to pay Stem's "Loss" for which Stem indemnified the Directors and Officers and which the Directors and Officers have become legally obligated to pay by reason of the 2017 Buzby Loan Claim.  Scottsdale is not obligated to pay Stem's "Loss" arising from the 2013 Series B Financing Claim.[7]  Accordingly, Scottsdale is liable for breach of contract to the extent that Scottsdale has refused to cover Stem's losses arising by reason of the 2017 Buzby Loan Claim, but is not liable to the extent that Scottsdale has refused to cover Stem's losses arising by reason of the 2013 Series B Financing Claim.

Thus, the Court grants in part and denies in part Stem's motion for summary judgment on Stem's breach of contract claim, and grants in part and denies in part Scottsdale's motion for summary judgment on Stem's breach of contract claim.

### C.     The Implied Covenant of Good Faith and Fair Dealing

Stem alleges that Scottsdale breached the implied covenant of good faith and fair dealing when Scottsdale wrongfully denied coverage under the terms of the insurance policy and failed to undertake a meaningful investigation of Stem's request for coverage before denying it.  Compl. ¶ 46.  Scottsdale moves for summary judgment on this claim,

---

[7] Scottsdale argues that the settlement payments that Stem made in 2019 as well as the demands for restitution of shares in the 2017 Shareholder Lawsuit do not fall under the relevant definition of insurable "Loss" under the insurance policy.  Scottsdale MSJ at 19–20.  These arguments go to the magnitude of the Loss under the policy, an issue not squarely presented by the instant motions. Because Scottsdale has not explained why other losses like attorneys' fees, costs, and damages are excluded from the definition of "Loss," Scottsdale's argument fails to establish that the general coverage provision does not apply.

United States District Court
Northern District of California

arguing that Scottsdale owed no coverage to Stem under the policy.  Scottsdale MSJ at 23. In the alternative, Scottsdale argues that even if the policy covers Stem's Claim or Claims, Scottsdale did not act unreasonably in denying coverage because there was a genuine dispute as to whether these Claims were covered.  Id.  The Court concludes as a matter of law that Scottsdale did not breach the implied covenant of good faith and fair dealing.

"It has long been recognized in California that '[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.'"  Kransco v. Am. Empire Surplus Lines Ins. Co., 23 Cal. 4th 390, 400 (2000) (quoting Comunale v. Traders & General Ins. Co. 50 Cal.2d 654, 658 (1958).  "This principle applies equally to insurance policies, which are a category of contracts."  Id.  "The responsibility of the insurer to act in good faith is not the requirement mandated by the terms of the policy itself but is imposed by law, breach of which sounds in tort notwithstanding that the denial of benefits may also constitute breach of the contract."  Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1158 (9th Cir. 2002).

Under California law, the elements of a cause of action for breach of the implied covenant of good faith and fair dealing are that "(1) benefits due under the policy must have been withheld and (2) the reason for withholding benefits must have been unreasonable or without proper cause."  Nationwide Mut. Ins. Co. v. Ryan, 36 F. Supp. 3d 930, 941 (N.D. Cal. 2014) (internal quotations omitted).  "The test for determining whether an insurer is liable for breach of the implied covenant turns on whether the insurer's alleged refusal or delay was unreasonable."  Id.  "In the context of an insurance policy, the terms and conditions of the policy define the duties and performance to which the insured is entitled."  Kransco, 23 Cal. 4th at 400 (internal quotations omitted).  But "where there is a genuine issue as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute."  Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co., 90 Cal. App. 4th 335, 347 (2001), as modified on denial of reh'g (July 30, 2001).  If a genuine

United States District Court
Northern District of California

dispute exists, the Court may decide as a matter of law that the denial of benefits was reasonable.  Chateau Chamberay, 90 Cal. App. 4th at 347.

Scottsdale acted reasonably in denying coverage for Claims in the 2017 Shareholder Lawsuit.  The disputes as to (1) whether the Claims in the 2017 Shareholder Lawsuit constitute one Claim or two Claims, and (2) whether those Claims were connected or interrelated to the 2010 Employment Dispute, were genuine.  The complaint in the 2017 Shareholder Lawsuit rhetorically characterized the suit as a continuation of the 2010 Employment Dispute.  See generally Stem MSJ Ex. C.  It was reasonable for Scottsdale to rely on that characterization, even if a closer analysis ultimately revealed that the 2017 Buzby Loan Claim was entirely unconnected to the 2010 Employment Dispute.  That the Court has ruled, in part, against Scottsdale does not mean that Scottsdale acted in bad faith.  See Chateau Chamberay, 90 Cal. App. 4th at 347.  Stem's evidence regarding Scottsdale's investigation into the Claim, see Stem Opp'n to MSJ at 17–19, does not show that Scottsdale's investigation was objectively unreasonable or conducted in bad faith in any respect—even if it led Scottsdale to a conclusion with which Stem disagrees and the Court partially disagrees.[8]

Therefore, the Court grants Scottsdale's motion for summary judgment on the breach of the implied covenant of good faith claim.  And because Stem requested punitive damages and attorneys' fees for Scottsdale's alleged breach of the implied covenant of good faith, the Court grants Scottsdale's motion for summary judgment on the punitive damages and attorneys' fees issues as well.[9]

## IV.   CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Stem's motion for summary judgment—and grants in part and denies in part Scottsdale's motion for

---

[8]  Notably, Scottsdale was correct that it owed no coverage for the 2013 Series B Financing Round Claim.
[9]  For the same reasons discussed above, the Court would conclude that there is no genuine issue of material fact regarding whether Scottsdale acted with oppression, fraud, or malice, see Cal. Civ. Code § 3294, or the question whether Stem is entitled to attorneys' fees under Brandt v. Superior Ct., 37 Cal. 3d 813, 817 (1985).

summary judgment.  Stem is entitled to partial summary judgment on Stem's breach of contract claim because Scottsdale breached its defense obligations with respect to the 2017 Buzby Loan Claim, which was part of the underlying 2017 Shareholder Lawsuit.  The Court otherwise denies Stem's motion for summary judgment.  Scottsdale is entitled to partial summary judgment on Stem's breach of contract claim because Scottsdale did not breach its defense obligations with respect to the 2013 Series B Financing Claim, which was part of the underlying 2017 Shareholder Lawsuit.  Scottsdale is also entitled to summary judgment on Stem's breach of the implied covenant of good faith and fair dealing claim, along with Stem's request for punitive damages and attorneys' fees.  The Court denies Scottsdale's motion for summary judgment on the breach of contract claim with respect to the 2017 Buzby Loan Claim.

In light of these rulings, the Court vacates the June 13, 2021 trial date, the May 27, 2021 pre-trial conference, the April 30, 2021 deadline for dispositive motions, and the May 14, 2021 expert discovery cut-off date.  The parties are instructed to file a joint status report on or before May 21, 2021.

**IT IS SO ORDERED.**

Dated: May 3, 2021

CHARLES R. BREYER
United States District Judge